[Nos. 29809-29810. *En Banc.* December 12, 1945.]

THE STATE OF WASHINGTON, *on the Relation of Lumber and Sawmill Workers et al., Plaintiff,* v. THE SUPERIOR COURT FOR PIERCE COUNTY *et al., Respondents.*[1]

THE STATE OF WASHINGTON, *on the Relation of United Brotherhood of Carpenters and Joiners et al., Plaintiff,* v. THE SUPERIOR COURT FOR GRAYS HARBOR COUNTY *et al., Respondents.*[1]

'Reported in 164 P. (2d) 662.

*Wettrick, Flood & O'Brien,* for relators.

*Ray De Kraay, Houghton, Cluck & Coughlin,* and *Robert C. Finley,* for respondents.

MILLARD, J.—The International Woodworkers of America (hereinafter designated I. W. A.), locals Nos. 9 and 129, are voluntary associations affiliated with the Congress for Industrial Organization commonly known as the C. I. O. E. O. Lohre *et al.* are officers and members of the two voluntary associations. The membership of the I. W. A. works in the lumber industry from stump to finished product. The geographical units of the I. W. A. are designated "district councils." Collective bargaining on behalf of the local unions is negotiated by an agency of the international

negotiating committee in Portland, Oregon, which is composed of representatives from each district in the northwest.

The two I. W. A. locals had a contract with the St. Paul & Tacoma Lumber Company in Pierce county, Washington, under which the locals were the sole collective bargaining agencies in that plant in accordance with the national labor relations act (29 U. S. C. A., § 151 *et seq.*). The contract in question is subject to termination June 1st of each year and may be reopened upon notice prior to that date for changes which are desired. Prior to June, 1945, the contract with the St. Paul & Tacoma Lumber Company was not automatically renewed as to prior wage scales, but a new wage of $1.15 an hour minimum rate in lieu of the minimum rate of 90¢ an hour in the old contract was demanded. The employer and the I. W. A. were unable to effect a settlement of the dispute, whereupon negotiations were had and still are continuing under the auspices of the United States conciliation service. In August, 1945, a poll of the membership within the area under the jurisdiction of the international negotiating committee on the question of authorization of a strike resulted overwhelmingly in favor of delegation of authority to the international negotiating committee to call a strike whenever the committee saw fit to do so.

Within the jurisdiction of the membership of the I. W. A. are the states of Oregon, Washington, Idaho, Montana, and northern California. The I. W. A. has jurisdiction of all logging, sawmill, plywood, and box plant operations in those states. The I. W. A. negotiated through and with all employer associations including the lumbermen's industrial relations committee, with which the St. Paul & Tacoma Lumber Company is affiliated, as well as other employer associations within the area.

The Tacoma district council is a member of the northwestern council of the Lumber and Sawmill Workers, which negotiates for the American Federation of Labor all matters within collective bargaining with the various employer associations, including the lumbermen's industrial

relations committee, which is the same employer committee of which the St. Paul & Tacoma Lumber Company is a subscribing member. The northwestern council's efforts, commenced in June, 1945, to obtain a twenty-five per cent wage increase raising the minimum wage from 90¢ to $1.10 an hour, were unsuccessful, whereupon a strike vote was had in August which resulted in authorization of the A. F. of L. membership to strike. The strike was called in September, 1945. The American Federation of Labor picketed the Congress for Industrial Organization plants to induce industry-wide action on wage demands.

The testimony is in conflict as to the number of pickets at the plant of St. Paul & Tacoma Lumber Company in Pierce county the first day, September 26, 1945, picketing commenced; however, it is clear that, while there may have been mass picketing in the beginning, the number was considerably reduced. There was no violence, no list of names kept of those going through or refusing to go through the picket line. On petition of the I. W. A. and its officers, the superior court of the state of Washington for Pierce county entered an order enjoining the northwestern council *et al.* from maintaining a picket line at the plant of the St. Paul & Tacoma Lumber Company.

The Grays Harbor district council A. F. of L., which is composed of employees engaged in lumber and logging operations, joined with members of the Lumber and Sawmill Workers A. F. of L. in the demand for a minimum wage of $1.10 an hour throughout the lumber industry. The members of the foregoing organization who were on strike in an endeavor to achieve the purpose stated, caused a picket line to be placed at and near certain lumber and sawmill plants in Grays Harbor county employing members of the I. W. A. In this case, as in the Pierce county case, the I. W. A. had been formally certified by the national labor relations board as the sole collective bargaining agency.

The facts in the two cases are not dissimilar. Those affiliated with the A. F. of L. were endeavoring to persuade those affiliated with the C. I. O. to co-operate with the A. F. of L. in its endeavor to obtain an equal wage adjust-

ment in favor of all employees, whether A. F. of L. or C. I. O., in the lumber industry. There was no violence in connection with the picketing. There was no interference with, or intimidation of, any employee.

In the Grays Harbor county case, as in the Pierce county case, on petition of the I. W. A. and its officers, an order was entered enjoining the affiliates of the A. F. of L. from picketing the plants. No member of the A. F. of L. was employed in any of the plants involved in the two cases.

The two causes have been consolidated and are now before us on certiorari to review the restraining orders.

The question is, as stated by relators: May a state court enjoin one labor union from peacefully picketing the plant of an employer who, pursuant to an order of the national labor relations board, recognizes another labor union as bargaining agent, where the purpose of the picketing is to urge the employees who are members of the certified collective bargaining agency to pursue a course of action similar to that which the other union is following in a campaign waged by both unions for a similar wage increase throughout the industry common to both?

Respondents insist that they, as well as relators, are equally interested in the maintenance of the right of labor to organize, bargain collectively, picket, and to strike; and that they are interested, too, in a broad and liberal recognition of the right of free speech and other civil rights. It is argued, however, that the long-run interests of labor require the recognition of reasonable limitations upon picketing, which should be used as a means of securing concessions from employers but should never be used against labor itself. It further urged that the restraining orders entered by the superior courts were justified by fair application of the national labor relations act (29 U. S. C. A., § 151 *et seq.*).

So far as pertinent, the act reads as follows:

"The denial by employers of the right of employees to organize and the refusal by employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest, which have the intent

or the necessary effect of burdening or obstructing commerce by (a) impairing the efficiency, safety, or operation of the instrumentalities of commerce; (b) occurring in the current of commerce; (c) materially affecting, restraining, or controlling the flow of raw materials or manufactured or processed goods from or into the channels of commerce, or the prices of such materials or goods in commerce; or (d) causing diminution of employment and wages in such volume as substantially to impair or disrupt the market for goods flowing from or into the channels of commerce.

"The inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers who are organized in the corporate or other forms of ownership association substantially burdens and affects the flow of commerce, and tends to aggravate recurrent business depressions by depressing wage rates and the purchasing power of wage earners in industry and by preventing the stabilization of competitive wage rates and working conditions within and between industries.

"Experience has proved that protection by law of the right of employees to organize and bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing certain recognized sources of industrial strife and unrest, by encouraging practices fundamental to the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and by restoring equality of bargaining power between employers and employees.

"It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U. S. C. A., § 151.

"It shall be an unfair labor practice for an employer—

"(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title.

"(2) To determine or interfere with the formation or administration of any labor organization or contribute

financial or other support to it: *Provided,* That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay.

"(3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization: *Provided,* That nothing in sections 151-166 of this title or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization (not established, maintained, or assisted by any action defined in sections 151-166 of this title as an unfair labor practice) to require as a condition of employment membership therein, if such labor organization is the representative of the employees as provided in section 159 (a) of this title, in the appropriate collective bargaining unit covered by such agreement when made.

"(4) To discharge or otherwise discriminate against an employee because he has filed charges or given testimony under sections 151-166 of this title.

"(5) To refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title." 29 U. S. C. A., § 158.

"Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* That any individual employee or a group of employees shall have the right at any time to present grievances to their employer." 29 U. S. C. A., § 159 (a).

In support of their position that the picketing was properly enjoined, respondents invoke *Bloedel Donovan Lbr. Mills v. International Woodworkers of America,* 4 Wn. (2d) 62, 102 P. (2d) 270, where, respondents contend, we recognized that the right to bargain implies the right to bargain free of deliberate outside pressures which materially interfere with it. Respondents argue that the purpose of the A. F. of L. organizations, which are clearly outside of the unit appropriate for the purpose of collective bargaining under the national labor relations board act, with the em-

ployers of the members of the C. I. O., is to cause a closing of the plants in which the C. I. O. members are employed and to disrupt the negotiations of the C. I. O. with the employers unless the C. I. O. negotiating committee follows the pattern of negotiation laid down by the A. F. of L. negotiating committee.

In other words, if we follow respondents, the picketing was illegal and was properly enjoined because the purpose and effect of the picketing were to cause a breach of the labor contracts between the C. I. O. unions and the employers.

Relators contend that the problem presented in the cases at bar is one of freedom of speech, a right guaranteed by the first amendment to the constitution of the United States reading as follows:

"Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

Relators argue that peaceful picketing is but a manifestation and a function of the exercise of freedom of speech and can be restrained only upon those grounds and conditions which warrant restraint in any other case involving freedom of speech.

The right of freedom of speech guaranteed by the first amendment, and originally confined to Federal jurisdictions and to acts of Congress, has been extended to protect against encroachment by judicial, legislative, or administrative acts of the various states under the scope of the fourteenth amendment to the United States constitution which provides:

"No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."

In *Jensen v. Cooks' & Waiters' Union,* 39 Wash. 531, 81 Pac. 1069, 4 L. R. A. (N.S.) 302, we held that peaceful picketing was illegal and that persons cannot lawfully jointly congregate about the entrance of anyone's place of business and there, either by persuasion, coercion, or force prevent patrons and the public from entering his place of business or dealing with him.

In *St. Germain v. Bakery & Confectionery Workers' Union,* 97 Wash. 282, 166 Pac. 665, L. R. A. 1917F, 824, we condemned picketing whether peaceful or otherwise, holding that to picket the premises of another was in and of itself an action of intimidation and an unwarrantable interference with the rights of the person picketed; and that it made no difference in effect whether the picketing was done ten or one thousand feet distant from the premises of the one picketed.

The foregoing opinion was overruled by *Sterling Chain Theaters v. Central Labor Council,* 155 Wash. 217, 283 Pac. 1081, where we held picketing was legal if the pickets walked a regular beat one hundred feet distant from the entrances to the two theaters picketed. *Sterling Chain Theaters v. Central Labor Council, supra,* follows *Adams v. Local No. 400 of Cooks & H. W. & W.,* 124 Wash. 564, 215 Pac. 19, in which we held it was not an arbitrary exercise of its equity powers for a trial court to prohibit picketing within a fixed radius of one hundred feet from the front entrances of the places of business in question.

In *Safeway Stores v. Retail Clerks' Union,* 184 Wash. 322, 51 P. (2d) 372, we held there was no labor dispute within the provisions of our statute (Laws of 1933, Ex. Ses., chapter 7, p. 10), prohibiting the issuance of an injunction in cases involving a labor dispute, where the only purpose of the picketing of the complainant's stores was to compel the employees to join the picketing union and there was no dispute or controversy with the owner of the stores or with the employees of those stores over the terms and conditions of the employment or at all. We held that the complainant was entitled to an injunction against the picketing union.

*Safeway Stores v. Retail Clerks' Union,* 184 Wash. 322, 51 P. (2d) 372, was overruled by *Yakima v. Gorham,* 200 Wash. 564, 94 P. (2d) 180, in which we held that a city ordinance which prohibits peaceful picketing by workers in the course of labor disputes is void, since it conflicts with the public policy of the state as declared by the legislature in chapter 7, Laws of 1933, Ex. Ses. The statute cited, which provides that the term "labor dispute" includes any controversy regardless of whether the disputants stand in the proximate relation of employer and employee, was copied from the Federal anti-injunction statute (29 U. S. C. A., § 101 *et seq.*).

▪ It is unnecessary to review the opinions of this court prior to *O'Neil v. Building Service Employees,* 9 Wn. (2d) 507, 115 P. (2d) 662, 137 A. L. R. 1102, in which we held that, by virtue of the right of free speech guaranteed by the Federal constitution, a labor union has the legal right peacefully to picket the place of business of a person who has no employees, for the purpose of coercing and compelling, against his will, such lone person or individual proprietor to join the picketing union; and that injunction will not lie to restrain the union from such picketing. We there followed *American Federation of Labor v. Swing,* 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568, which, in effect, held that the right of peaceful picketing derived from the first amendment to the Federal constitution, which guaranteed freedom of speech. We accepted the interpretation by the United States supreme court that, under the constitution, peaceful picketing derives from freedom of speech, and that any restriction of peaceful picketing must be limited to the grounds upon which abridgment of the liberty of discussion is justifiable.

In *Schenck v. United States,* 249 U. S. 47, 63 L. Ed. 470, 39 S. Ct. 247, the United States supreme court defined, as follows, the test upon which abridgment of speech could be justified:

"The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring

about the substantive evils that Congress has a right to prevent."

In *Herndon v. Lowry,* 301 U. S. 242, 81 L. Ed. 1066, 57 S. Ct. 732, it was held that there was no *dangerous tendency* in the words of Herndon who, in violation of a statute of the state of Georgia, publicly advocated the cause of communism and solicited proselytes to its party. The court said:

"The power of a state to abridge freedom of speech and of assembly is the exception rather than the rule and the penalizing even of utterances of a defined character must find its justification in a reasonable apprehension of danger to organized government. The judgment of the legislature is not unfettered. The limitation upon individual liberty must have appropriate relation to the safety of the state. Legislation which goes beyond this need violates the principle of the Constitution. If, therefore, a state statute penalize innocent participation in a meeting held with an innocent purpose merely because the meeting was held under the auspices of an organization membership in which, or the advocacy of whose principles, is also denounced as criminal, the law, so construed and applied, goes beyond the power to restrict abuses of freedom of speech and arbitrarily denies that freedom."

An enactment of the Texas legislature required labor organizations to register with and obtain an organizer's card from a designated state official before soliciting memberships in labor unions. While a state court order restraining one Thomas, a vice-president of the C. I. O., from violating the statute was in effect, Thomas addressed a meeting and solicited members in a union affiliated with the C. I. O. He was sentenced to a fine and imprisonment for contempt. The conviction was set aside in *Thomas v. Collins,* 323 U. S. 516, 65 S. Ct. 315 (decided January 8, 1945), by the United States supreme court, which held that the statute imposed a restraint upon appellant's rights of free speech and free assembly in violation of the first and fourteenth amendments of the Federal constitution, and that the restriction of the liberties guaranteed by the first

amendment can be justified only by clear and present danger to the public welfare. The court said:

"The case confronts us again with the duty our system places on this Court to say where the individual's freedom ends and the State's power begins. Choice on that border, now as always delicate, is perhaps more so where the usual presumption supporting legislation is balanced by the preferred place given in our scheme to the great, the indispensable democratic freedoms secured by the First Amendment. Cf. *Schneider v. State*, 308 U. S. 147; *Cantwell v. Connecticut*, 310 U. S. 296; *Prince v. Massachusetts*, 321 U. S. 158. That priority gives these liberties a sanctity and a sanction not permitting dubious intrusions. And it is the character of the right, not of the limitation, which determines what standard governs the choice. Compare *United States v. Carolene Products Co.*, 304 U. S. 144, 152-153.

"For these reasons any attempt to restrict those liberties must be justified by clear public interest, threatened not doubtfully or remotely, but by clear and present danger. The rational connection between the remedy provided and the evil to be curbed, which in other contexts might support legislation against attack on due process grounds, will not suffice. These rights rest on firmer foundation. Accordingly, whatever occasion would restrain orderly discussion and persuasion, at appropriate time and place, must have clear support in public danger, actual or impending. Only the gravest abuses, endangering paramount interests, give occasion for permissible limitation. It is therefore in our tradition to allow the widest room for discussion, the narrowest range for its restriction, particularly when this right is exercised in conjunction with peaceable assembly. It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances. All these, though not identical, are inseparable. They are cognate rights, cf. *De Jonge v. Oregon*, 299 U. S. 353, 364, and therefore are united in the First Article's assurance. Cf. 1 Annals of Congress 759-760.

"This conjunction of liberties is not peculiar to religious activity and institutions alone. The First Amendment gives freedom of mind the same security as freedom of conscience. Cf. *Pierce v. Society of Sisters*, 268 U. S. 510; *Meyer v. Nebraska*, 262 U. S. 390; *Prince v. Massachusetts*, 321 U. S. 158. Great secular causes, with small ones, are

guarded. The grievances for redress of which the right of petition was insured, and with it the right of assembly, are not solely religious or political ones. And the rights of free speech and a free press are not confined to any field of human interest.

"The idea is not sound therefore that the First Amendment's safeguards are wholly inapplicable to business or economic activity. And it does not resolve where the line shall be drawn in a particular case merely to urge, as Texas does, that an organization for which the rights of free speech and free assembly are claimed is one 'engaged in business activities' or that the individual who leads it in exercising these rights receives compensation for doing so. Nor, on the other hand, is the answer given, whether what is done is an exercise of those rights and the restriction a forbidden impairment, by ignoring the organization's economic function, because those interests of workingmen are involved or because they have the general liberties of the citizen, as appellant would do. . . .

" . . . This Court has recognized that 'in the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. . . .' [*Thornhill v. Alabama*, 310 U. S. 88.]" *Thomas v. Collins*, 323 U. S. 516, 529.

To the same effect is *Bridges v. California*, 314 U. S. 252, 86 L. Ed. 196, 62 S. Ct. 190, in which the court held that the freedom of speech and the press secured by the first amendment of the Federal constitution against abridgment by the United States is likewise secured to all persons by the fourteenth amendment of the Federal constitution against abridgment by a state. The convictions of a newspaper publisher and editor based on the publication of editorials commenting upon cases pending in a state court were set aside on the ground that they were violative of constitutional rights of freedom of speech and of the press. See, also, *Hague v. C. I. O.*, 307 U. S. 496, 83 L. Ed. 1423, 59 S. Ct. 954.

In *Thornhill v. Alabama*, 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736, an Alabama statute which made it unlawful to picket a place of lawful business for the purpose of interfering with, or injuring, such business, was held invalid

and the appellant's conviction thereunder was set aside on the ground that freedom to peacefully picket is equivalent to freedom of speech and freedom of religion.

As argued by counsel for relators, the United States supreme court in *Thornhill v. Alabama, supra,* enunciated the rule, to which it has consistently adhered to the present time, that wherever one has a lawful right to express an opinion on the street, on the platform, and in the press, such person has the same right without abridgment to express it on the picket line. In other words, if relators have a right on the street, on the platform, or in the press to recommend to his neighbor, who is a member of the C. I. O., that he pursue a certain course of action, relators have the same right to urge and persuade similar action on the picket line. In *Thornhill v. Alabama, supra,* the court said:

"The freedom of speech and of the press, which are secured by the First Amendment against abridgment by the United States, are among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a State.

"The safeguarding of these rights to the ends that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion is essential to free government. Those who won our independence had confidence in the power of free and fearless reasoning and communication of ideas to discover and spread political and economic truth. Noxious doctrines in those fields may be refuted and their evil averted by the courageous exercise of the right of free discussion. Abridgment of freedom of speech and of the press, however, impairs those opportunities for public education that are essential to effective exercise of the power of correcting error through the processes of popular government."

In *Thornhill v. Alabama, supra,* the only question presented was the validity of the restraint imposed by the state under color of its statute against picketing for the purpose denounced by the statute of inducing persons not to have business dealings with a certain firm or business. This is clear from the court's language as follows:

"The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment. . . . Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.

"In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. *Hague v. C. I. O.*, 307 U. S. 496; *Schneider v. State,* 308 U. S. 147, 155, 162-63. See *Senn v. Tile Layers Union,* 301 U. S. 468, 478. It is recognized now that satisfactory hours and wages and working conditions in industry and a bargaining position which makes these possible have an importance which is not less than the interests of those in the business or industry directly concerned. The health of the present generation and of those as yet unborn may depend on these matters, and the practices in a single factory may have economic repercussions upon a whole region and affect widespread systems of marketing. . . . It may be that effective exercise of the means of advancing public knowledge may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute. Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests. Abridgment of the liberty of such discussion can be justified only where the clear danger of substantive evils arises under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion. We hold that the danger of injury to an industrial concern is neither so serious nor so imminent as to justify the sweeping proscription of freedom of discussion embodied in [the statute] § 3448."

In *S and W Fine Foods v. Retail Delivery, etc. Union,* 11 Wn. (2d) 262, 118 P. (2d) 962, we followed *American*

*Federation of Labor v. Swing, supra,* and overruled *Safeway Stores v. Retail Clerks' Union,* 184 Wash. 322, 51 P. (2d) 372; *Adams v. Building Service Employees Int. Union,* 197 Wash. 242, 84 P. (2d) 1021; *Fornili v. Auto Mechanics' Union,* 200 Wash. 283, 93 P. (2d) 422; and *Shively v. Garage Employees Local Union,* 6 Wn. (2d) 560, 108 P. (2d) 354. We held that the right of a labor union peacefully to picket the plant of an employer is protected by the first and fourteenth amendments to the Federal constitution guaranteeing the right of free speech, even if there is no employer-employee relationship existing between the employer and the members of the union. We held that injunction would not lie to restrain members of a salesmen's union from picketing the warehouse of a wholesale dealer in an endeavor to compel the dealer's salesmen to join the union, even though such picketing resulted in the refusal of the dealer's warehousemen to cross the picket line and in the refusal of the union teamsters to haul its merchandise, where it appeared that the picketing was peaceable and that it was not associated with a secondary boycott. See *Weyerhaeuser Tbr. Co. v. Everett District Council,* 11 Wn. (2d) 503, 119 P. (2d) 643 to the same effect.

In *Hague v. C. I. O.,* 307 U. S. 496, it was held that freedom to disseminate information concerning the provisions of the national labor relations act and to assemble peaceably for the discussion of the act is a privilege provided by the first amendment to the Federal constitution and secured against abridgment by the fourteenth amendment to the constitution, and that ordinances forbidding the distribution of printed matter and the holding, without permits, of public meetings in streets and other public places were void.

In *Bakery Drivers and Helpers Local 802 v. Wohl,* 315 U. S. 769, 86 L. Ed. 1178, 62 S. Ct. 816, members of a labor union of drivers, engaged in the distribution of baked goods, in an endeavor to induce peddlers to work only six days a week and to hire an unemployed union member one day a week, peacefully picketed bakeries from which the peddlers obtained their goods and places of business of the peddlers' customers, carrying placards with the peddlers'

names and a true statement of the union's grievances. The supreme court of the United States held that a state court injunction against such picketing was an unconstitutional invasion of the right of free speech, and that the right of free speech does not depend in such a case on whether a "labor dispute," as defined by the state statutes, is involved.

In *Cafeteria Employees Union v. Angelos,* 320 U. S. 293, 88 L. Ed. 58, 64 S. Ct. 126, the picketing was by a union against an employer who operated his own restaurant on a small scale, conducting the business without the aid of any employees, and the sole purpose of the picketing was to compel the proprietor to employ union help. The United State supreme court held, which is in harmony with *American Federation of Labor v. Swing,* 312 U. S. 321, which we followed in *O'Neil v. Building Service Employees Int. Union,* 9 Wn. (2d) 507, 115 P. (2d) 662, that the injunction by the state court infringed upon the right of free speech.

On authority of *American Federation of Labor v. Swing, supra,* the United States supreme court, in *Journeymen Tailors Union Local No. 195 v. Miller's, Inc.,* 312 U. S. 658, reversed the New Jersey court of errors and appeals (128 N. J. Eq. 162, 15 A. (2d) 822) for issuing an injunction against picketing on the ground that there was no permissible labor dispute. The employer had employed a union tailor under contract and at the termination of his contract refused to renew the employment. In lieu thereof a tailor was employed from another and a rival union. The former employee, whose contract had terminated, invoked the services of the union of which he was a member to picket the employer as unfair to labor. The New Jersey court, on the ground that the controversy ceased with the termination of employment, was of the view that there was no labor dispute. The holding of the United States supreme court is to the effect that labor has the right to picket even when there is no privity of relationship between the union and the employer. We have already cited and reviewed *Thomas v. Collins,* 323 U. S. 516, which sustains the position of relators.

Under the terms of a state statute, the Wisconsin employ-

ment relations board directed a union and its officers to cease mass picketing of the employers' property, from threatening personal injury or property damage to employees desiring to work, from obstructing the entrance to and egress from the employers' factory and from picketing the homes of the employees. In *Allen-Bradley v. Labor Board,* 315 U. S. 740, 86 L. Ed. 1154, 62 S. Ct. 820, the United States supreme court sustained the judgment of the Wisconsin court, which affirmed the order of the board. On the facts, that case is distinguishable from the cases at bar, in which there was no mass violence, nor was there intimidation of any kind. *Allen-Bradley v. Labor Board, supra,* and *Milk Wagon Drivers Union v. Meadowmoor Dairy,* 312 U. S. 287, 85 L. Ed. 836, 61 S. Ct. 552, 132 A. L. R. 1200, hold that a state is at liberty, under the fourteenth amendment of the Federal constitution, to use injunctive powers vested in its courts for the prevention of violence by labor unions in industrial disputes. No such situation is presented in the cases at bar. The pickets were urging nothing more than a course of action upon the C. I. O. which the C. I. O. had the right to adopt and which relators had the right to recommend.

*Bloedel Donovan Lbr. Mills v. International Woodworkers of America,* 4 Wn. (2d) 62, 102 P. (2d) 270, is distinguishable from the cases at bar. In the *Bloedel Donovan* case, in which we sustained a judgment enjoining the picketing of the plants of the Bloedel Donovan company, the national labor relations board had certified one union as the exclusive bargaining agency. A minority union called a strike and picketed the employer's business for the sole purpose, as stated in the opinion, of doing away with the closed shop agreement with the bargaining agent which the national labor relations board had certified as the exclusive bargaining agency. The minority union was proceeding unlawfully. Its demand that the employer breach its agreement with the certified bargaining agency was an endeavor to compel the employer to violate the terms of the Wagner act, and if the employer had acceded to the demand, the employer would have been guilty of unfair labor prac-

tices, subjecting the employer to penalties under the Federal statute. In the cases at bar, the relators are not seeking anything from the employers. They have not done anything which savors of an attempt to compel the employers to do that which is unlawful. They have not attempted to compel the employers to deal with the A. F. of L. instead of with the C. I. O. There is no conflict with Federal or state law. In soliciting mutual co-operation with the C. I. O., the A. F. of L. exercised a right guaranteed to it under the national labor relations act, 29 U. S. C. A., § 151 *et seq.*

*Markham & Callow, Inc. v. I. W. A.*, 170 Ore. 517, 135 P. (2d) 727, cited by respondents to sustain their position, like the *Bloedel Donovan* case, is distinguishable from the cases at bar. The picketers sought to induce Markham & Callow to violate the national labor relations act, hence the court was correct in granting the injunction. Relators have done nothing in the cases at bar to induce the C. I. O. to breach its contract with its employer.

■ The argument that the national labor relations act had for its purpose the prevention of picketing such as obtains in the cases at bar, is without merit. Such a situation as is present in the cases at bar was not within the contemplation of the legislators when the national labor relations law was enacted in 1932, which was three years prior to the secession of the C. I. O. from the A. F. of L.

■ Nor can we agree that the injunctions should be sustained on the ground that the purpose of relators is to induce a violation of contracts. The A. F. of L. is not, as stated above, soliciting a breach of contract by the C. I. O. with its employers. We should add that the suppression of freedom of speech may not be sanctioned upon the ground that its exercise may, as an incidental result thereof, lead to a breach of contract. Legal remedies in tort, or on specific performance, or otherwise, may be open to the parties affected, but a mere claim of tort or breach of contract is not sufficient to justify the court in advance to restrain freedom of speech. See *Near v. Minnesota ex rel. Olson*, 283 U. S. 697, 75 L. Ed. 1357, 51 S. Ct. 625.

Business losses involving breach of contract incidental

to picketing were held by the supreme court of California to be insufficient grounds to warrant restraint of picketing and suppression of speech. *McKay v. Retail Auto Salesmen,* 16 Cal. (2d) 311, 106 P. (2d) 373. That case involved an attempt by a union with no members employed by the plant in question to compel nonunion employees—they had at least an oral contract with their employer—to join the union and to compel the company to accept a union shop agreement with the union. The nonunion employees sought an injunction to prohibit picketing. The court decided in favor of the picketing union. The foregoing, in principle, is indistinguishable from the cases at bar and sustains relators' position.

■ The argument of respondents that the exercise of the right of freedom of speech on the part of relators may be suppressed for the reason that relators seek to close the plants in which the C. I. O. members are employed, is without substantial merit. The relators are doing only what, under the authorities, they have a legal right to do; therefore, their acts are not unlawful. If the ultimate effect of the picketing be to close the plants, that result would occur because of the acquiescence of the C. I. O. employees who accepted the counsel of the A. F. of L. pickets. It is the purpose of the A. F. of L. to communicate a point of view—there is nothing in the national labor relations act which expressly or impliedly prohibits such conduct—to the C. I. O. employees, who are free to decide whether they will agree or disagree with the view of the A. F. of L.

It is unnecessary to review all of the authorities cited. *O'Neil v. Building Service Employees Int. Union, supra,* is controlling. It is in harmony with *American Federation of Labor v. Swing, supra,* and subsequent opinions of the United States supreme court, which hold that the constitutional guaranty of freedom of speech may not be abridged by judicial policy of a state to forbid resort to peaceful persuasion through picketing.

Peaceful picketing is a manifestation of the exercise of freedom of speech, and it can be restrained only upon those

grounds and conditions which warrant restraint in any other case involving freedom of speech. The test upon which abridgment of speech may be justified

". . . is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *Schenck v. United States,* 249 U. S. 47, 52.

See, also, *Herndon v. Lowry,* 301 U. S. 242, and *Thomas v. Collins,* 323 U. S. 516.

The peaceful picketing in the cases at bar is but an exercise of the right of freedom of speech and is not of such a nature as to warrant the restraining orders.

The causes are remanded, with direction to superior courts to vacate the restraining orders.

BLAKE, ROBINSON, and SIMPSON, JJ., concur.

MALLERY, J. (concurring)—The supreme court of the United States holds that picketing is an exercise of the right of free speech which is guaranteed by the first amendment to the Federal constitution. Both sides agree with that interpretation and accept the first amendment to the Federal constitution as the foundation upon which the right to picket is based.

The right of minorities to attempt to persuade majorities to their point of view is thought to advance the cause of truth. The exercise of the right of free speech is therefore not dependent upon majority support or authoritative approval. Even though collectively exercised, it is based upon an individual constitutional right.

In the instant case, the relators oppose the restraining order upon the constitutional ground that the individual pickets are exercising their individual constitutional right of free speech. This they have a right to do. Majorities opposed to them cannot deprive them of their right. This court is not concerned with whether the thing said is an individual opinion or an accurate expression of an authoritative action by some entity. Any attempt by this court to insure that the representation made by a picket line be authoritative can only be accomplished at the expense of

restricting the individual's constitutional right of free speech.

It has been suggested that a picket line is more than a mere exercise of the right of free speech on the part of those composing it; that it is, in fact, a representation to the public and all those concerned, of an authoritative or majority position taken by those properly concerned in a situation involving the interests of labor, and that its effectiveness is dependent upon it being so considered. It is urged that, in the long run, it would be better to restrain unauthorized representations by undisciplined picket lines for labor's own best interests.

These are not constitutional considerations. They are matters of union policy only, with which this court is not concerned. Only the forces of labor can preserve the effectiveness of the picket line as an authoritative expression of their position by following a course of action appropriate to that end. If they lack that unity of method or purpose which will best serve their ends, they must look to themselves, not to the courts, for guidance. This court can declare the law. It cannot supervise labor policies or map out courses to follow.

BEALS, C. J. (dissenting)—As stated in the majority opinion, we have before us for review by way of certiorari two temporary injunctions, one signed, October 22, 1945, by the superior court for Pierce county and the other, October 23, 1945, by the superior court for Grays Harbor county. The questions presented in the two cases being identical, they have been consolidated for hearing before this court.

The matters leading up to the issuance of the temporary injunctions are stated in the majority opinion.

Many cases have been cited by relators and respondents, and several decisions of the supreme court of the United States, and some of our decisions, are discussed in the opinion of the majority. That opinion holds that the cases discussed therein control the situation here presented and require that the orders before us for review be reversed. The supreme court of the United States, in the decisions cited, construed the first amendment to the Federal consti-

tution and held that, under the evidence in the cases before it, picketing was a lawful exercise of the right of freedom of speech guaranteed to the people by that amendment, which also guarantees to the people the exercise of certain other fundamental rights.

The rights guaranteed by the first amendment to the constitution and by other provisions of the constitution itself and amendments thereto have very frequently been subjects of consideration by the supreme court of the United States and the supreme courts of all of the states of the Union, and have often been construed as not permitting on the part of citizens certain acts claimed to be unlawful, as free exercise of religion, freedom of the press, and the right to bear arms.

The controversies here presented concern disagreements between two labor organizations pursuing the common objective of attempting to secure an increase of wages from their respective employers, the two groups following different methods in endeavoring to attain the result desired. No employer is a party to either one of the proceedings before us. The members of the Congress of Industrial Organization have been for some time negotiating with their employers in an endeavor to obtain an increase of wages, acting through a regularly chosen bargaining agent and following the method prescribed by the national labor relations act, 29 U. S. C. A., § 151 *et seq.*

The American Federation of Labor, through some of its unions whose members are engaged in the same class of work as the members of the C. I. O. unions above referred to, has called strikes against those employers whose employees are members of the A. F. of L. unions.

In order to induce C. I. O. union members to also declare strikes against their employers, the A. F. of L. established picket lines in the vicinity of the plants operated by employers of C. I. O. members. Picket lines, of course, were established in the belief that the C. I. O. union workers would not pass through them. This was the picketing temporarily enjoined by the orders before us for review.

Respondents contend that many of their C. I. O. union

men would not pass through the picket lines and would be deprived of lawful employment. They also claim that their collective bargaining negotiations with their employers whereby their unions seek an increase of wages were interfered with by the picketing and cannot be carried on while the picket line exists, and that for this reason the attempt to adjust their controversy with their employers over wages by the method provided by Federal law is unlawfully interfered with and seriously prejudiced.

It seems to me that the questions here presented disclose a situation very different from that found in the cases cited by counsel for the respective parties to these proceedings, and that the authorities referred to are of little assistance in determining the application to these questions of the first and fourteenth amendments to the Federal constitution.

This controversy is between two labor organizations having the common objective of securing an increase of wages from the employers of their members, but, for the present at least, differing as to the method to be followed in attaining that objective. The A. F. of L., having no existing recognized wage agreement with the employers of its members, has called a strike. The C. I. O. has a wage agreement with the employers of its members which has never been repudiated by either party and is still in effect, and the members of this organization are now engaged in negotiating with their employers through their regularly chosen bargaining agency and are following the method prescribed by the national labor relations act above referred to.

The picket lines established by the A. F. of L. and maintained until enjoined pending the final result of the two proceedings, were established for the purpose of inducing C. I. O. union members to quit their work, which would necessarily retard or terminate the further progress of the negotiations with their employers.

A series of recent decisions by the supreme court of the United States has laid down the general rule that peaceful picketing is a method employed for conveying information of the fact that the picketing organization and its members

have some complaint against or dispute with others, and that, if the picketing be in fact peaceful, it falls within the classification of free discussion and dissemination of information and is an expression of its right of free speech and as such is protected by the first amendment to the Federal constitution against abridgment by the United States and made secure against interference by any state authority by the fourteenth amendment.

From some of the recent decisions by the supreme court of the United States, for example, *Thornhill v. Alabama,* 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736; *American Federation of Labor v. Swing,* 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568; and *Bakery & Pastry Drivers & Helpers Local 802 v. Wohl,* 315 U. S. 769, 86 L. Ed. 1178, 62 S. Ct. 816, one might conclude from the broad language used that the supreme court has indicated that peaceful picketing as a method of the exercise of the right of free speech has scarcely any limitation, regardless of its effects on others, economically or otherwise.

However, in the recent case of *Carpenters Union v. Ritter's Cafe,* 315 U. S. 722, 86 L. Ed. 1143, 62 S. Ct. 807, the supreme court of the United States affirmed a decree of the Texas court of civil appeals, which the supreme court of that state refused to review by a writ of error, enjoining the picketing of a cafe owned by one Ritter, who was also constructing a building a mile and a half from the cafe, his building contractor having chosen to employ nonunion labor. The supreme court had brought before it for review the decree of the Texas court for the purpose of considering the claim that the Texas decree "infringed the freedom of speech guaranteed by the Due Process Clause of the Fourteenth Amendment," and held that the decree enjoining the picketing did not constitute a violation of the constitutional guaranty.

It appears, then, that the constitutional right of free speech does not, of itself, in all cases preclude a state court from enjoining the maintenance of a picket line.

It would seem that no absolute rule can be laid down

whereby the permitted extent of, or limitations upon, peaceful picketing can in all cases be measured.

Several of the decisions of the supreme court of the United States contain expressions which, if taken from their setting and applied literally, may seem to answer a particular question one way or the other; but when these expressions are considered in connection with the entire language of the opinion and in the light of the facts of the case and the precise question before the court for determination, such expressions become less dogmatic, and the language of the different decisions may be reconciled one with the others.

It would seem that the supreme court, after holding that peaceful picketing is a method of "speech" as that word is used in the first and fourteenth amendments to the constitution, has recognized that the act of picketing has a double aspect, in that it disseminates information as to certain alleged facts relevant to a grievance or a dispute, and also that a "peaceful" picket line forms an artificial barrier which by custom is recognized by persons in sympathy with the view of those maintaining the picket line and often by others, with the result that persons to whom the information is so conveyed are likely to conduct themselves generally in accordance with the view of the pickets and those maintaining them.

It is well known that a picket line established by a labor union will generally restrain members of other unions from crossing the picket line, and that, if they do cross that line, they are likely to suffer certain economic and other disadvantages.

As speech by word of mouth or by the printed word has not been regarded as effective as a picket line, the latter activity has presented to legislative bodies and to the courts many complex problems in connection with the constitutional guaranty of free speech, and, on the other hand, guaranteed constitutional rights possessed by persons adversely affected by a picket line.

This necessarily leads to the conclusion that the right to exercise "free speech" by the establishment of a picket

line cannot be absolute, and that, in each situation presented, a court must ascertain the facts of the case, the real purpose of the picketing, and the objective sought thereby, as well as its effects; and if one injuriously affected by the picketing can show that a picket line has been unlawfully established, such a party may obtain from the court an order enjoining the continued maintenance of the pickets.

Naturally, many questions presented to the courts for determination are difficult of solution, and in determining whether the maintenance of a picket line may be enjoined as based upon an unlawful purpose or objective, no rule of universal or even general application can be laid down. Each case must be governed by its particular facts.

The preamble to the national labor relations act, 29 U. S. C. A., § 151, reads in part as follows:

"It is hereby declared to be the policy of the United States to eliminate the causes of certain substantial obstructions to the free flow of commerce and to mitigate and eliminate these obstructions when they have occurred by encouraging the practice and procedure of collective bargaining . . ."

In the case at bar, the members of the C. I. O. unions are, and for some time have been, endeavoring to adjust their labor disputes with their employers strictly in accord with the provisions of the national labor relations act. This act includes a provision requiring that an employer bargain collectively with his employees through the medium of a bargaining agency chosen by them. In the cases at bar, the C. I. O. employees had selected their bargaining agency, which had been certified by the national labor relations board as such, and the employers and the bargaining agency were negotiating in an attempt to effect a mutually satisfactory settlement of the question of wages to be paid to the employees.

This was the situation when relators demanded that the members of the C. I. O. unions declare a strike, and upon refusal of this demand, relators established the picket lines which were enjoined.

It soon became evident that the effect of the picket lines would be to frustrate the efforts which had been and were being made by and on behalf of the C. I. O. unions to attain by collective bargaining the objective they sought, namely, an agreement between the parties concerning fixing wages. Examination of the record leads inevitably to the conclusion that the result of the picketing would be to defeat the possible accomplishment of the very end the attainment of which the act sought to foster and encourage, and indeed required should be attempted to be attained by "bargaining."

I am of the opinion that the picketing was therefore unlawful and not justified as within the protection of the constitutional provisions guaranteeing the right of free speech.

In the case of *Bloedel Donovan Lbr. Mills v. International Woodworkers of America,* 4 Wn. (2d) 62, 102 P. (2d) 270, it appeared that a controversy had arisen between two labor organizations, each claiming to be the collective bargaining agent of the employees of the mill. A poll of the employees regularly taken had resulted in a choice of one of the two groups as the bargaining agent for the employees, and the result of the election had been certified by the national labor relations board and one group named as the duly chosen bargaining agency. After a working agreement had been entered into between this bargaining agency and the employer, the other labor organization, composed of the minority of the employees, established a picket line at the entrance to the plant, the picketing having been peaceful.

The employer then instituted the proceeding seeking an injunction against the picketing. After a hearing, the superior court granted a temporary injunction as demanded by the plaintiff, and on appeal from that order this court, sitting *En Banc,* affirmed the order.

It appeared that the purpose of the picketing was to interfere with or abrogate the agreement which had been made between the employer and the certified bargaining agency representing the majority group of the employees.

If the intent and purposes of the national labor relations

act are to be accomplished, certainly, when an employer and his employees have collectively bargained in accordance with the act, it would be unlawful for another group of employees to picket the plant of the employer for the evident purpose of interfering with or nullifying that which had been accomplished by the collective bargaining, even though the picketing be peaceful.

It would seem that the only distinction between the case cited and the cases at bar is that, in the former case, the employer whose plant was picketed brought the action against persons who were members of a union representing a minority group of its employees. The real controversy out of which the action arose was one between two labor unions. The proceeding might just as well have been brought by the members of the union representing the majority of the employees, in which event it would seem that the situation would be almost identical with that here presented. The fact that the defendant was a union to which a minority group of the employees belonged would present a question no different in principle from a case in which some union representing employees of other plants had attempted to interfere by forming a picket line.

While the question of free speech as protected by the constitutional provisions above referred to was not referred to in our opinion, I am convinced that any claim that the picketing was protected by those constitutional guaranties would not have been considered as controlling, in view of the unlawful purpose and object of the picket line. It was just as unlawful for the relators here to establish their picket lines in order to cause a situation which would interfere with the pending collective bargaining proceeding between respondent unions and the employers, and possibly render those efforts abortive, as was the picket line the maintenance of which was enjoined in the *Bloedel Donovan* case.

In my opinion, the case cited is nowise in conflict with the decisions of the supreme court of the United States relied upon by relators, and should be followed and the orders appealed from affirmed.

While it might well be argued that the orders should be affirmed as being merely temporary injunctions, *pendente lite,* I agree with the majority that the cases should be decided on the merits.

Jeffers, J., concurs with Beals, C. J.

Steinert, J. (dissenting)—The majority opinion, following the modern current of authority upon which it relies, proceeds upon the theory that "peaceful picketing" is a manifestation of free speech guaranteed by the first and fourteenth amendments to the Federal constitution. The concurring opinion seemingly is in accord with that view. Upon that theory, both opinions reach the conclusion that it is beyond the power of the courts to enjoin a labor union from picketing an industrial plant whose employees are members of a rival union, where the purpose of such picketing is to induce the rival union to accept and adopt the policies of the picketing union with reference to strikes and wage demands. The dissenting opinion by Judge Beals also accepts as settled law the modern idea that, as a general proposition, picketing is a lawful exercise of the right of free speech, but, upon the peculiar facts involved in the two instant cases, concludes that the activities of A. F. of L., the picketing union, transcended the permissible ambit of "peaceful picketing" and therefore are not within the protection of the constitutional guaranty.

I concede that, upon an unhesitating acceptance of the premise on which it is founded, the majority opinion finds ample justification in a series of latter-day decisions of the United States supreme court and of this court as well. Those same decisions, however, can also be read in a way to furnish logical support for the aforementioned dissenting opinion, and were it not that it accepted the expressed premise I would readily join in that dissent. But my unwillingness to accept the adopted premise compels me not only to dissent from the majority opinion, but also to withhold my unqualified concurrence with the dissenting opinion.

I have long entertained the view, and the precedent decisions above mentioned have only served to solidify that

view into a fixed opinion, that picketing, whether "peaceful" or otherwise, is not a manifestation of free speech, but, on the contrary, is nothing less than economic pressure, economic coercion, or economic warfare, whichever of those terms may be the most suitable to the particular occasion. Futhermore, as I observe the unremitting trend of those decisions and note the consequences which have inevitably followed, I think that the pronouncement of this modern concept has been the harbinger of the industrial chaos which now stares us in the face from all around. If there is a single person, or group of persons, in these United States today who does not fully comprehend, or at least does not clearly sense, the nature, purpose, and effect of "picketing," such person, or group of persons, must surely be found among the wearers of the judicial robe.

I do not believe that those wise and strong-willed men who labored long and painstakingly to fashion that immortal document known as the United States constitution, and made provision for the Bill of Rights, later incorporated therein in the form of amendments, ever conceived, much less intended, that their ideal of "freedom of speech" should become a Baal, before whom all the inalienable rights of life, liberty, and the pursuit of happiness must ever bow down. Note the premise from which those men proceeded, as expressed in the preamble to the organic document:

"We, the people of the United States, in order to form a more perfect union, establish justice, insure domestic tranquility, provide for the common defense, promote the general welfare, and secure the blessings of liberty to ourselves and our posterity, do ordain and establish this constitution for the United States of America."

Well might that preamble be here italicized as containing the heart and soul of the supreme law of the land as then and there formulated.

The men who chiselled out that monument of the law knew well the fiber of the people whom they represented and knew also the evils from which such people were resolved to be forever free. Their knowledge of history

reached back to the Reformation, the Renaissance, and the English Bill of Rights, and they were immeasurably imbued with the spirit that gave birth to the Declaration of Independence. They were cognizant of the many forms of oppression to which the peoples of preceding centuries had been subjected by kings, princes, and potentates of those eras, and they were determined that the people of this new nation should forever have the right to voice their opinions and their grievances against those whom they should select, from time to time, to govern them.

Historically, freedom of speech, which was given a place upon the same pedestal as were freedom of religion, freedom of the press, and freedom of the people peaceably to assemble and to petition the government for redress of grievances, guaranteed to the people the unabridged right to the free expression of opinion concerning political subjects and matters of general public interest. During all of a period covering approximately two hundred fifty years from the date of pronouncement of that guaranty, it was never thought that freedom of speeech was a vehicle for conducting economic warfare by private groups, one against another. During all, or most, of that period also it was generally understood and accepted that the several states, and not the Federal government, had jurisdiction to determine the legality of labor activities. Since strikes, picketing, and boycotts interfered with a free market, such activities were considered by some courts to be common-law torts *per se*, without any legal justification, and by other courts as *prima facie* common-law torts permissible only when legal justification therefor was shown.

It has been only within the last decade that the identification of "peaceful picketing" with the right to freedom of speech has come into vogue. This modern concept seems to have had its first intimation in a dictum expressed in the case of *Senn v. Tile Layers Protective Union*, 301 U. S. 468, 81 L. Ed. 1229, 57 S. Ct. 857, wherein the court made this statement:

"Members of a union might, without special statutory authorization by a State, make known the facts of a labor

dispute, for freedom of speech is guaranteed by the Federal Constitution."

The modern idea did not come into full flower, however, until the period between 1940 and 1942, during which time the United States supreme court handed down its decisions in the cases of *Thornhill v. Alabama,* 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736; *Carlson v. California,* 310 U. S. 106, 84 L. Ed. 1104, 60 S. Ct. 746; *American Federation of Labor v. Swing,* 312 U. S. 321, 85 L. Ed. 855, 61 S. Ct. 568; and *Bakery Drivers & Helpers Local 802 v. Wohl,* 315 U. S. 769, 86 L. Ed. 1178, 62 S. Ct. 816.

By those decisions and others which followed in their wake, including a number from our own state, picketing has been judicially identified with free speech, under the protecting aegis of the Federal constitution.

How has this sudden change in recent years come about? The technique by which it has been accomplished has been quite simple, yet utterly devastating of former conceptions, under which picketing was considered a species of civil wrong, classed at least as a *prima facie* common-law tort and permissible only upon a showing of legal justification. This complete transformation of thought has been consummated by the judicial linking of two conceptions: one taking the form of encomium and panegyric addressed to the constitutional guaranty of free speech—with which we can all sincerely agree; and the other, a characterization of picketing as being a means of disseminating information and enlightening the public with respect to matters which are of public concern and therefore a manifestation of free speech—with the implications of which I am unable to agree.

The full effect of this new doctrine may not have riveted one's attention upon a cursory reading of these recent decisions. Upon further consideration, however, one will discover that almost in the twinkling of a judicial eye the entire status of picketing and its relation to formerly accepted principles of law have been completely reversed. In the first place, picketing is no longer a tort, *per se* or *prima facie,* but is now clothed with the habiliments of a

constitutional right; in the second place, the state courts have been virtually shorn of their power to enjoin or put limitations upon picketing activities, such as those involved in these two cases, and have been relegated to a position having but little more authority than a rubber stamp; and, finally, no legislative body can henceforth validly enact any law controlling the realm of picketing or placing any restrictions upon it, so long as picketing continues to be a manifestation of free speech. For if such activity be identified with freedom of speech, sanctified by the Federal constitution, then no court and no legislative body, whether it be a state legislature or the national Congress, can in any way whatever abridge the right to exert that propensity.

If picketing draws its sustenance and maintains its virility through some umbilical connection with free speech, then no court can sever that connection between parent and child. And when a picketing activity assumes to function of its own accord, no court can say, as many courts including our own have heretofore frequently said, that a picket line shall be limited to only five or ten men, for no individual can be deprived of his personal right to speak freely or be compelled to express his sentiments through the mouth of another. Nor can any court, in the face of such constitutional sanctification, fix, as many courts including our own have heretofore fixed, the limits within which a picket may patrol, for if the right of speech be free and unabridged, it may be exercised wheresoever in whatever manner one may select, whether on the platform, on a public street, or through the press.

This is not all. The constitutional guaranty is not to be limited to situations arising only out of labor activities. If, in the exercise of his right of free speech, a picket may carry a banner publicizing the merits of his cause and the demerits of his opponent's contentions, then a merchant or a group of merchants may institute a similar practice, parading with banners in the neighborhood of competitive establishments, extolling the superiority and cheapness of price of their own wares as compared with the inferiority

and exhorbitant prices of the wares sold in the picketed establishment; and the picketing merchants may well justify such activities on the ground that in the economy of life the public is vitally concerned in securing the best goods obtainable at the lowest prices possible.

Many other illustrations could be cited, but, like those given above, they all demonstrate that it is a misnomer to say that picketing is a manifestation of free speech, and an anomaly to align the virtues of the one with the vices of the other. To regard picketing as an analogue of free speech, is like extolling the principle of freedom of travel on the high seas, then pointing to a balloon overhead and calling it a boat. Regardless of what the balloon be called, no one would take passage in it in the belief that he was about to enjoy a trip upon the water.

I believe that a serious mistake has been made in lifting picketing activities from their traditional category and giving them the label and connotations of free speech. I am of this opinion not only because I believe that this new concept does violence to the language and spirit of the Federal constitution, but also because it inaugurates a *ratio decidendi* which will lead on to an ever-increasing volume of industrial strife and chaos.

Picketing is not cast in the mold of freedom; it is economic warfare. Nor is it speech, in the sense that it is intended to convey legitimate information which the public seeks and desires to know. Members of the public do not approach a picket line to be educated, but, rather, endeavor to keep as far away from it as possible in order to avoid embarrassing situations.

The instant cases are striking illustrations of the perversion of freedom of speech. Members of the C. I. O. are deprived of their desire and freedom to work, under their existing contract, by a picket line which they dare not cross. To say that the purpose of the picket line is to inform and educate the members of C. I. O. concerning the rights and desires of labor generally is ridiculous. They already have as much education on that subject as have their informers. What those members seek, and what they are

entitled to secure, is to be let alone in their endeavor to work for their employers, with whom they have no quarrel.

As shown by the majority opinion, this is strictly an altercation between two labor unions and their respective members. If that were the only significant thing involved in the present situation, those two bodies might well be left to work out their own differences. But the matter here has a larger and more serious aspect. The purpose of this particular picketing activity is to close the plant of the employer, to prevent access to a free market, and, for the time being, to deprive the public of those products which it sorely needs. The rights of the employer and the general citizenry are held in contempt, solely because a certain group of workmen insist upon exercising their so-called right of free speech through a form of picketing activity. The victims play the part of the "forgotten man."

For the reasons herein stated, I am of the opinion that picketing as conducted in this instance is a tort, not a constitutionally protected right; and that the circumstances demonstrate that it is not legally justified and, therefore, should be permanently enjoined. I therefore dissent from the majority opinion and concur only in the result of the preceding dissenting opinion.