[No. 29988.   *En Banc.*   February 19, 1947.]

H. F. SWENSON, *Appellant,* v. SEATTLE CENTRAL LABOR COUNCIL *et al., Respondents.*[1]

[1] Reported in 177 P. (2d) 873.

*Grosscup, Ambler & Stephan,* for appellant.

*Bassett & Geisness* and *L. Presley Gill,* for respondents.

*Caughlan & Hatten, amicus curiae.*

SCHWELLENBACH, J.—This is a jurisdictional dispute. At no time during the course of the controversy did the relationship of employer and employee exist between the plant and the pickets.

For a number of years, H. F. Swenson, doing business as Sweden Freezer Manufacturing Company, operated a small plant in Seattle for the manufacture of ice cream freezers for commercial use. He had never employed union labor. However, for several years, every six months or so, he had been contacted concerning the unionizing of the plant by representatives of various craft unions connected with the American Federation of Labor. January 11, 1946, the Building and Construction Trades Council of San Francisco wrote a letter to the Seattle Building and Construction Trades Council, stating that the Sweden manufacturing company had been placed on its unfair list and asking that an investigation be made. January 23rd, representatives of three craft unions called on Mr. Swenson and showed him the letter. A discussion followed lasting a couple of hours, at which time it was agreed that the men would come back later.

When the representatives had left, Mr. Swenson found a Mr. Stewart waiting for him. He represented the International Association of Machinists. (This is a national organization consisting of six hundred thousand members. It has two thousand locals, has been in existence since 1888, and has a membership of between twenty-three and twenty-five thousand in the Seattle area. It was disassociated by the American Federation of Labor in January, 1945.) Mr. Stewart informed him that his (Swenson's)

employees had asked the Machinists to represent them and he had called a meeting at its hall. He presented Swenson with a notice of the meeting and asked him to put one in the envelope of each employee. Swenson refused to do this, taking the stand he should not take part in any controversy between any of the various unions.

Be that as it may, on February 1st, the International Association of Machinists filed a petition with the national labor relations board for certification as the exclusive bargaining agency of all the employees of the Sweden manufacturing company. On the same day, the national labor relations board informed the employer of the petition. Meanwhile, February 5th, Mr. McCaffrey of the Steamfitters Local Union No. 473, Mr. Day of Local B-46, International Brotherhood of Electrical Workers, and Mr. Jarvis of the Sheet Metal Workers Union, Local 99 (all affiliated with the American Federation of Labor), called on Mr. Swenson. He told them he was busy. They returned in a couple of days or so. At that time, they stated that they wished to go into the plant to talk to the men, but Swenson would not permit them to do so. He explained that the national labor relations board had instructed him not to take part in anything which might influence the men.

February 5th, Mr. Swenson, in response to the notification received from the national labor relations board, called on Mr. McClaskey, its field examiner in Seattle, and gave him the required information concerning the number of employees, kinds of work performed, etc. The following day, McClaskey contacted the representatives of the Electrical Workers, the Steamfitters, and Sheet Metal Workers, and met with them February 7th. He informed them of the filing of the petition by the International Association of Machinists, advised them concerning the national labor relations board's rules as to intervention, which provide that any labor organization desiring to intervene must substantiate its claim with membership evidence amounting to at least ten per cent of the number of employees in the bargaining unit which it claimed was

the appropriate one for the purposes of collective bargaining. (In this respect, if the protesting unions had been able to show that they had one member who was an employee of the plant, they would have been allowed to intervene.) The rules of the board also provide that a showing must be made within five days of the receipt of the notification. The unions were given seven days. No showing was made.

February 18th, an agreement for a cross-check was entered into between the Sweden manufacturing company and the International Association of Machinists. It provided for a cross-check by the regional director of the national labor relations board of all appropriate union and employer records, including union membership cards and applications, authorization cards to be furnished by the union, and a pay-roll list to be supplied by the employer. It was agreed that, should a majority of the employees designate the union, copies of the agreement and of the attached notice would be posted in conspicuous places for a period of five days. The agreement then provided:

"At the conclusion of the 5-day posting period, if the Regional Director is of the opinion that no valid cause to the contrary has been shown, he will issue a Report on Cross-Check finding and determining that the Union has been designated and selected as the exclusive bargaining representative of all employees in the Unit."

The attached notice provided:

"The Agreement for Cross-Check appearing below has been executed in settlement of a question concerning representation arising under the National Labor Relations Act. The cross-check has been made pursuant to such agreement and it appears therefrom that the Union has been designated by a majority of the employees within the Unit.

"PLEASE TAKE NOTICE that unless cause to the contrary is shown to the undersigned Regional Director on or before five (5) days from the date hereof, he will issue a Report on Cross-Check finding that the Union has been designated and selected as the exclusive representative of the employees in the Unit, which will constitute complete and final disposition of the question concerning representation."

The report on the cross-check was issued February 28th. The following finding was made:

"Number of employees in the agreed Unit      32
"Number designating the Union named below 29"

The report continued:

"The undersigned, therefore, pursuant to Section 4 of the Agreement for Cross-Check, hereby finds and determines that INTERNATIONAL ASSOCIATION OF MACHINISTS is the exclusive representative of all the employees in the Unit defined in Section 1 of the Agreement for Cross-Check for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment."

Meanwhile, February 11, 1946, the Electrical Workers Union, Local No. B-46 (one of the American Federation of Labor unions involved in this dispute), filed with the secretary of labor, the national war labor board, and the national labor relations board, a notice of intention to strike under the war labor disputes act. The notice stated the intention of the union members to cease their employment with the Sweden manufacturing company due to a labor dispute. It further stated:

"A concise statement of the issue is: The Union's desire and said firm refuses to recognize the Union as the sole bargaining representative for employees engaged in electrical construction, maintenance and repair in connection with building construction, repair and maintenance, and with respect to construction, installation, repair and maintenance of electrical equipment, machines, motors, generators, switchboards, substations and apparatus, etc.

"The Union is authorized by a large majority of said employees as their sole collective bargaining agency."

It should be remembered that at this time no member of the Electrical Workers Union was employed at the plant.

February 14th, the Seattle Building Trades Council informed Mr. Swenson by letter that charges had been preferred against his company, that a hearing would be held February 19th, and inviting him to be present and show cause why action should not be taken against him. Similar letters were written on February 18th by the Seattle Metal

Trades Council and, March 1st, by the Central Labor Council. To one or two of the letters Mr. Swenson replied and asked for further time, which was granted. He later requested additional information as to the charges. He never advised them concerning the cross-check which was then in progress. He attended only one of the hearings.

March 25th, at a meeting of the Seattle Metal Trade Council's executive board, it was moved, seconded, and carried to put a picket line around the Sweden manufacturing company. The next day, March 26th, pickets appeared at the plant. There was no mass picketing. They were limited to two during the day and one at night. There was no violence. The workers were not molested and were permitted to go back and forth through the picket line. However, the effects of the picketing were felt immediately.

On the first day, a Railway Express Agency's truck drove up to the loading platform and made a delivery. On its way out, the pickets stopped the truck and talked to the driver. It never returned. Later that day, another truck came to the plant, was stopped by the pickets, who talked to the driver, and the truck drove away without making a delivery. The company was unable to get deliveries in or out of the plant. It was without some materials and very low in others. It was just about out of fuel. Members of the Teamsters' union refused to go through the line. The company owned a pickup truck, but could not operate it for the reason that the driver, who was a member of the Teamsters' union, could not cross the line.

Finally, on April 12th, a temporary restraining order and order to show cause was issued. The pickets left, and deliveries were resumed. Mr. Swenson testified that, had not the restraining order been issued, he would have had to close immediately. Later, April 23rd, a temporary injunction was issued, and the case was set for trial on its merits. At the conclusion of the trial on its merits, the restraining order and temporary injunction were dissolved, and this appeal followed. Subsequent to the appeal, the appellant applied to this court to have continued the tem-

porary restraining order pending appeal. August 12th, this court sustained the trial court in refusing to fix a supersedeas bond pending appeal. *Swenson v. Seattle Central Labor Council,* 25 Wn. (2d) 612, 171 P. (2d) 699. It is safe to assume, from what transpired while the plant was picketed from March 26th to April 12th, that the plant is now closed.

The trial court found that a labor dispute existed. The Norris-LaGuardia act, 29 U.S.C.A. 74, § 113 (47 Stat. 73, § 13) (which is also the law of the state of Washington, Rem. Rev. Stat. (Sup.), § 7612-13 [P.P.C. § 695-25]), defines a labor dispute, and provides:

" . . . (a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is (1) between one or more employers or associations of employers and one or more employees or associations of employees; (2) between one or more employers or associations of employers and one or more employers or associations of employers; or (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a 'labor dispute' (as defined in this section) of 'persons participating or interested' therein (as defined in this section).

"(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

"(c) The term 'labor dispute' includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether

or not the disputants stand in the proximate relation of employer and employee. . . ."

Mr. McCaffery, business agent for the Steamfitters Local, in relating the conversation had at the plant, on the second visit, between Mr. Swenson and Mr. Day, Mr. Jarvis, and himself, testified as follows:

"Q. Did you know that the question of certification of the representative of the production workers in his plant was then before the National Labor Relations Board? A. I had heard that. Q. You knew that, didn't you? Do you know that? A. I had heard it was about— . . . Q. Did he tell you at that time that this matter was before the Board? That is the question. Just answer yes or no. A. Yes. . . . Q. Do you recall at that time any one of those two meetings, or at the subsequent meeting, Mr. Jarvis telling Mr. Swenson that if they were unsuccessful in connection with this National Labor Relations Board proceeding, that they would prevent the equipment being manufactured at the Swenson Company being transported or installed anywhere in the United States? A. I would say that it was said, but as to who said it, I couldn't remember. . . .

"MR. AMBLER: At this meeting on the 7th, which I think was a Friday, or at a meeting on the 11th, which I think was a Monday, do you recall Mr. Jarvis or anyone else of your committee making the statement to Mr. Swenson that if the Board—National Labor Relations Board was unfavorable to your Unions that they would prevent the equipment of the Swenson Company being installed any place in the United States? . . . THE WITNESS: Well, if I can answer that, it was stated, but as to who stated it, I couldn't say. I can't remember that. Q. (By Mr. Ambler) It was made by one of the members of your committee? A. Yes, but who made it I don't know. There were several men there. I couldn't remember that far back as to who said it."

At the time the picketing started on March 26th, the International Association of Machinists was, by order of the national labor relations board, the exclusive bargaining agency for all of the employees at the plant, even though no contract had been drawn up at that time. This brings us to a determination of the question as to whether or not a jurisdictional dispute between rival unions is a "labor dispute" as defined by § 7612-13.

■ *Bloedel Donovan Lbr. Mills v. International Wood-workers of America,* 4 Wn. (2d) 62, 102 P. (2d) 270, held that, where the national labor relations board has determined the exclusive bargaining agency, as provided in the Wagner act, there cannot thereafter be a labor dispute between the employer and the minority union.

The only distinction which we have been able to find between that case and the one at bar, is that there, after one union had been certified by the national labor relations board, the employer entered into a working agreement with it as the sole collective bargaining agency for all employees, while here, no agreement had been entered into. That seems to us to be a distinction without a difference. Here, the International Association of Machinists had been certified as an exclusive representative of all the employees "for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment." It would have been unlawful for the employer to have negotiated with the American Federation of Labor unions while that order was in effect. As between the employer and the picketing unions, there was no labor dispute.

■ There could not have been a dispute "between one or more employees or associations of employees and one or more employees or associations of employees," as provided in the act, because here, no members of the picketing unions were employees of the Sweden manufacturing company. A jurisdictional dispute between rival unions can become a "labor dispute" provided the union members involved are employees of the same company, and provided further that no exclusive bargaining agency has been set up or provided for. Here, there was no labor dispute.

It is urged that *State ex rel. Lbr. & Sawmill Workers v. Superior Court,* 24 Wn. (2d) 314, 164 P. (2d) 662, is decisive of this case, because there, after the Congress for Industrial Organization unions had been constituted the sole bargaining agencies by the national labor relations board, the American Federation of Labor picketed the

plants. However, in that case, those affiliated with the American Federation of Labor were endeavoring to persuade *those affiliated with the Congress for Industrial Organization* to co-operate with the American Federation of Labor in its endeavor to obtain an equal wage adjustment in favor of all employees, whether American Federation of Labor or Congress for Industrial Organization, in the lumber industry. That was not the situation in this case. Here, the signs carried by the pickets read: "This plant is unfair to Seattle Building Trades Council, Seattle Metal Trades Council, Seattle Central Labor Council." There was no endeavor on the part of the pickets to persuade the members of the International Association of Machinists to co-operate with them in improving labor conditions. Such members were permitted to go through the picket lines without a word being said to them.

Finally, it is contended that, regardless of any statute, the men had an absolute right to peacefully picket as an exercise of the right of free speech guaranteed them under the Federal constitution. We have read all the decisions of the United States supreme court on this subject, commencing with *Thornhill v. Alabama,* 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736, through *Carpenters & Joiners Union of America v. Ritter's Cafe,* 315 U. S. 722, 86 L. Ed. 1143, 62 S. Ct. 807. In the latter case, the respondent had made an agreement with a contractor named Plaster for the construction of a building in Houston, Texas. Plaster employed non-union carpenters and painters in the work. The respondent was also the owner of a cafe, a mile and half distant from the building under construction. The new building was wholly unconnected with the cafe. All the restaurant employees were members of the Hotel and Restaurant Employees International Alliance, Local 808. There was no controversy between respondent and the restaurant employees. The carpenters' and painters' unions had no quarrel with respondent over his operation of the cafe. No carpenters or painters were employed there.

But because Plaster employed nonunion labor in the construction of a building a mile and a half away, members of

the unions picketed the respondent's cafe. Walking back and forth in front of the restaurant, a picket carried a placard which read: " 'This Place is Unfair to Carpenters and Joiners Union of America, Local No. 213, and Painters Local No. 130, Affiliated with American Federation of Labor.' " Later, the wording was changed as follows:

" 'The Owner of This Cafe Has Awarded a Contract to Erect a Building to W. A. Plaster Who is Unfair to the Carpenters Union 213 and Painters Union 130, Affiliated With the American Federation of Labor.' "

The Texas court found that Ritter's Cafe was picketed

" ' . . . for the avowed purpose of forcing and compelling plaintiff [Ritter] to require the said contractor, Plaster, to use and employ only members of the defendant unions on the building under construction in the 2800 block on Broadway.' "

Contemporaneously with this picketing, the Restaurant Workers Union, Local No. 808, called Ritter's employees out on strike and withdrew the union card from his establishment. Union truck drivers refused to cross the picket line to deliver food and other supplies to the restaurant. The effect of all this was

" ' . . . to prevent members of all trades-unions from patronizing plaintiff's cafe and to erect a barrier around plaintiff's cafe, across which no member of defendant-unions or an affiliate will go.' "

The Texas court enjoined this procedure, but the decree forbade neither picketing elsewhere (including the building under construction by Plaster) nor communication of the facts of the dispute by any means other than the picketing of Ritter's restaurant.

On p. 724, the court stated:

"The economic contest between employer and employee has never concerned merely the immediate disputants. The clash of such conflicting interests inevitably implicates the well-being of the community. Society has therefore been compelled to throw its weight into the contest. The law has undertaken to balance the effort of the employer to carry on his business free from the interference of others against the effort of labor to further its economic self-interest. And

every intervention of government in this struggle has in some respect abridged the freedom of action of one or the other or both.

"The task of mediating between these competing interests has, until recently, been left largely to judicial lawmaking and not to legislation. 'Courts were required in the absence of legislation, to determine what the public welfare demanded;—whether it would not be best subserved by leaving the contestants free to resort to any means not involving a breach of the peace or injury to tangible property; whether it was consistent with the public interest that the contestants should be permitted to invoke the aid of others not directly interested in the matter in controversy; and to what extent incidental injury to persons not parties to the controversy should be held justifiable.' Mr. Justice Brandeis in *Truax v. Corrigan,* 257 U. S. 312, 363. The right of the state to determine whether the common interest is best served by imposing some restrictions upon the use of weapons for inflicting economic injury in the struggle of conflicting industrial forces has not previously been doubted. See Mr. Justice Holmes in *Aikens v. Wisconsin,* 195 U. S. 194, 205, and Mr. Justice Brandeis in *Truax v. Corrigan, supra,* at 372, *Dorchy v. Kansas,* 272 U. S. 306, 311, and *Senn v. Tile Layers Protective Union,* 301 U. S. 468, 481. But the petitioners now claim that there is to be found in the Due Process Clause of the Fourteenth Amendment a constitutional command that peaceful picketing must be wholly immune from regulation by the community in order to protect the general interest, that the states must be powerless to confine the use of this industrial weapon within reasonable bounds.

"The constitutional right to communicate peaceably to the public the facts of a legitimate dispute is not lost merely because a labor dispute is involved, *Thornhill v. Alabama,* 310 U. S. 88, or because the communication takes the form of picketing, even when the communication does not concern a dispute between an employer and those directly employed by him. *American Federation of Labor v. Swing,* 312 U. S. 321. But the circumstance that a labor dispute is the occasion of exercising freedom of expression does not give that freedom any greater constitutional sanction or render it completely inviolable. Where, as here, claims on behalf of free speech are met with claims on behalf of the authority of the state to impose reasonable regulations for the protection of the community as a whole, the duty of this Court is plain. Whenever state action is challenged as

a denial of 'liberty,' the question always is whether the state has violated 'the essential attributes of that liberty.' Mr. Chief Justice Hughes in *Near v. Minnesota*, 283 U. S. 697, 708. While the right of free speech is embodied in the liberty safeguarded by the Due Process Clause, that Clause postulates the authority of the states to translate into law local policies 'to promote the health, safety, morals and general welfare of its people. . . . The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise.' *Ibid.*, at 707. 'The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side.' *Hudson Water Co. v. McCarter*, 209 U. S. 349, 355.

"In the circumstances of the case before us, Texas has declared that its general welfare would not be served if, in a controversy between a contractor and building workers' unions, the unions were permitted to bring to bear the full weight of familiar weapons of industrial combat against a restaurant business, which, as a business, has no nexus with the building dispute but which happens to be owned by a person who contracts with the builder. The precise question is, therefore, whether the Fourteenth Amendment prohibits Texas from drawing this line in confining the area of unrestricted industrial warfare. . . .

"It is true that by peaceful picketing workingmen communicate their grievances. As a means of communicating the facts of a labor dispute, peaceful picketing may be a phase of the constitutional right of free utterance. But recognition of peaceful picketing as an exercise of free speech does not imply that the states must be without power to confine the sphere of communication to that directly related to the dispute. Restriction of picketing to the area of the industry within which a labor dispute arises leaves open to the disputants other traditional modes of communication. To deny to the states the power to draw this line is to write into the Constitution the notion that every instance of peaceful picketing—anywhere and under any circumstances—is necessarily a phase of the controversy which provoked the picketing. Such a view of the Due Process Clause would compel the states to allow the disputants in a particular industrial episode to conscript neutrals having no relation to either the dispute or the industry in which it arose.

"In forbidding such conscription of neutrals, in the circumstances of the case before us, Texas represents the prevailing, and probably the unanimous, policy of the states. We hold that the Constitution does not forbid Texas to draw the line which has been drawn here. To hold otherwise would be to transmute vital constitutional liberties into doctrinaire dogma. We must be mindful that 'the rights of employers and employees to conduct their economic affairs and to compete with others for a share in the products of industry are subject to modification or qualification in the interests of the society in which they exist. This is but an instance of the power of the State to set the limits of permissible contest open to industrial combatants.' *Thornhill v. Alabama*, 310 U. S. 88, 103-04."

■ The United States supreme court has, by these cases, established this rule: Peaceful picketing is an exercise of the right of free speech. Organized labor has the right to communicate its views either by word of mouth or by the use of placards. This is nothing more nor less than a method of persuasion. But when picketing ceases to be used for the purpose of persuasion—just the minute it steps over the line from persuasion to coercion—it loses the protection of the constitutional guaranty of free speech, and a person or persons injured by its acts may apply to a court of equity for relief.

■ The facts in this case convince us that the picketing complained of did not constitute an exercise of free speech as contemplated by our founding fathers. Neither was it a means of communicating the facts of a labor dispute as interpreted by the United States supreme court. The national labor relations board had, by order, designated the International Association of Machinists as the exclusive bargaining agency of all the employees at the plant. The purpose of the picketing was to force the employer to deal with the picketing unions in defiance of this order, under the threat that, should he refuse to do so, his plant would be closed and his equipment prevented from being installed any place in the United States. This was coercion. Appellant was forced to close his plant. This resulted in irreparable loss to him, and his employees were thrown out of

employment. He had no adequate remedy at law. The restraining order theretofore entered should have been continued.

The decree is reversed.

MILLARD, ROBINSON, SIMPSON, and JEFFERS, JJ., concur.

STEINERT, J. (concurring in the result)—I concur with the majority solely upon the ground, as stated in its opinion, that the facts in this case demonstrate that the picketing complained of did not constitute an exercise of free speech as contemplated by our founding fathers, and that it was not a means of communicating the fact of a labor dispute, but that its purpose was simply to force the employer to deal with the picketing union, under the threat that, should he refuse to do so, his plant would be closed and his equipment prevented from being installed in any place in the United States.

I am still in accord with the views expressed by this court in *Bloedel Donovan Lbr. Mills v. International Woodworkers of America,* 4 Wn. (2d) 62, 102 P. (2d) 270, and *Shively v. Garage Employees Local Union No. 44,* 6 Wn. (2d) 560, 108 P. (2d) 354; and likewise retain the conviction which I endeavored to express in dissenting opinions in *O'Neil v. Building Service Employees International Union,* 9 Wn. (2d) 507, 115 P. (2d) 662, 137 A. L. R. 1102, and *State ex rel. Lbr. & Sawmill Workers v. Superior Court,* 24 Wn. (2d) 314, 164 P. (2d) 662.

ABEL, J. (dissenting)—The trial judge made findings of fact (these are amply sustained by the evidence) in which he found, among other things:

"(1) While the defendants were engaged in a dispute with the International Association of Machinists, and while defendant unions and the International Association of Machinists were attempting to organize the employees in plaintiff's plant, the plaintiff *voluntarily* signed with the International Association of Machinists a 'cross-check agreement,' whereby he agreed that all of his production and maintenance employees, including janitors, shipping and receiving department employees and inspectors, constituted an appropriate unit for the purpose of collective bargaining.

"(2) The plaintiff knew, at the time he signed the cross-check agreement, the defendants were claiming he was discriminating against them, paying wages below their scale, and failing to recognize their craft unions;

"(3) The plaintiff made no effort to negotiate with defendant unions or to delay the designation of a unit for collective bargaining by the National Labor Relations Board;

"(4) The plaintiff failed to attend meetings arranged by the defendants for the purpose of giving him an opportunity to show cause why he should not be placed on their respective 'unfair' lists;

"(5) By signing an agreement for cross-check with the International Association of Machinists the plaintiff did not maintain an attitude of neutrality, but became a partisan;

"(6) A *bona fide* labor dispute exists between the plaintiff and the defendants;

"(7) The plaintiff has failed to make every reasonable effort to settle said dispute either by negotiation or with the aid of any governmental machinery or mediation or voluntary arbitration;

"(8) *The National Labor Relations Board has neither made nor entered any order relative to the labor dispute involved herein, although it had notice of the dispute between the plaintiff and the defendants;* [Italics mine].

"(9) The National Labor Relations Board has never acted upon or entered an order upon the cross-check report made by its Acting Regional Director, and has never certified the International Association of Machinists as the exclusive collective bargaining representative of plaintiff's employees;

"(10) Since said cross-check report the plaintiff has not entered into any collective bargaining agreement with the International Association of Machinists; and

"(11) The picketing of which the plaintiff complains was at all times peaceful and did not involve any fraud, violence or violation of law."

There are two questions involved in this appeal: (1) Did a labor dispute exist? (2) The regional director of the national labor relations board having determined that a rival labor union was the exclusive representative of all the employees in the "unit" involved, did that fact make the picketing unlawful?

The majority opinion states that this is a jurisdictional dispute and then says:

"A jurisdictional dispute between rival unions can become a 'labor dispute' *provided* the union members involved are employees of the same company, and provided further that no exclusive bargaining agency has been set up or provided for." (Italics mine.)

There are two labor disputes in this case: (1) a dispute between appellant employer and respondent craft unions; (2) a dispute between the craft unions and the Machinists' union. The latter is a jurisdictional dispute. The former is not a jurisdictional dispute.

Rem. Rev. Stat. (Sup.), § 7612-13 (quoted in the majority opinion) defines a labor dispute but does not directly or by implication put any restriction upon the term as stated in the majority opinion.

The *Bloedel Donovan Lumber Mills* case, 4 Wn. (2d) 62, 102 P. (2d) 270, is cited as authority for the above-mentioned statement in the majority opinion, but that case only holds that a labor dispute did not exist under the facts in that particular case. There, the facts showed: (1) The employer was neutral. (2) Both sides submitted the dispute to the national labor relations board, which agency conducted an election and settled the question.

In the case at bar, the facts are entirely different. Here, the trial court found that the employer was an active participant in the controversy and was not neutral. There were ample facts to sustain that finding. In addition, there has never been a determination of the labor dispute between appellant and the craft unions.

The International Association of Machinists appeared *amici curiae* in behalf of appellant, and in their brief the following appears:

"*Amici curiae* take exception to the statement of appellants (Brief, pp. 22, 23, 24) that a labor dispute exists between the Machinists Union and the Craft Unions."

In reading appellant's brief at the pages indicated it is apparent that appellant took for granted that a labor dispute did exist between the craft unions and the Machinists' union.

This court held in *Blanchard v. Golden Age Brewing Co.*,

188 Wash. 396, 63 P. (2d) 397, that one of the reasons for determining that a labor dispute existed was:

"The employers did not remain aloof, as in the *Safeway* case, but, whether voluntarily or involuntarily, injected themselves, or permitted themselves to be injected, into the controversy between the immediate disputants."

There was not only a labor dispute between the respondent craft unions and the Machinists' union, but there was a labor dispute between the appellant employer and the respondent craft unions. The majority opinion dismisses the question of a labor dispute between the appellant and the craft unions merely by the statement that, as between the employer and the picketing unions, there was no labor dispute. There is no argument and no authority whatsoever to show that there was no labor dispute between the employer and the craft unions.

It might be argued that the case of *Shively v. Garage Employees Local Union No. 44,* 6 Wn. (2d) 560, 108 P. (2d) 354, is authority for the proposition that peaceful picketing of the place of business of an employer by a union which does not include in its membership any employee of such employer, for the purpose of persuading or coercing such employees to join the union against their will, is unlawful.

However, in the case of *O'Neil v. Building Service Employees International Union,* 9 Wn. (2d) 507, 115 P. (2d) 662, 137 A. L. R. 1102, it is stated as follows:

"The opinion in *Shively v. Garage Employees Local Union No. 44, supra,* was filed December 12, 1940. February 10, 1941, the United States supreme court, in *American Federation of Labor v. Swing,* 312 U. S. 321, 61 S. Ct. 568, held that the constitutional guaranty of freedom of discussion is infringed by judicial policy of a state to forbid resort to peaceful persuasion through picketing where there is no immediate employer-employee dispute as in the case of attempted unionization of the business employing nonmembers of the union."

The evidence shows that the basis of the labor dispute between appellant and respondents was the long-standing controversy (this had existed for several years) growing

out of the fact that appellant operated a nonunion shop. Numerous conferences had been held between appellant and respondent unions. Prior to the time that the Machinists' union entered the picture, the Building and Construction Trades Council of San Francisco wrote a letter dated January 11, 1946, to the Seattle Building and Construction Trades Council, stating that appellant had been placed on its unfair list. During the period between January 11th and February 1st, respondents conferred with appellant several times. The Machinists' union entered the controversy during this period and apparently signed up all the employees except two or three. Representatives of respondents were not permitted to see the employees.

A labor dispute existed between appellant and respondent craft unions for the following reasons:

(1) Appellant maintained a nonunion shop for more than 12 years, refusing to employ members of respondent craft unions and pay their respective wage scales.

(2) Appellant refused to permit respondents to speak to his shop employees during their lunch hour and thereby solicit them as their members.

(3) He failed to attend meetings arranged by respondents for the purpose of attempting to agree upon such matters.

(4) When appellant learned that the International Association of Machinists was also attempting to organize his employees, which Association was then engaged in a jurisdictional dispute with the respondent unions, he voluntarily signed an agreement for cross-check with the Machinists' union, thereby becoming a partisan in such jurisdictional dispute.

The majority opinion cites the *Bloedel Donovan* case, *supra,* and *Carpenters & Joiners Union of America v. Ritter's Cafe, supra,* as authority for holding that the picketing in this case was not an exercise of the right of free speech nor was it a means of communicating the facts of a labor dispute; that, since the national labor relations board had designated the International Association of Machinists as

the exclusive bargaining agency, the purpose of the picketing was therefore to force the employer to deal with the picketing unions in defiance of this order; that this was coercion and therefore illegal and should be enjoined.

I agree with the holding of the United States supreme court in the case of *Carpenters & Joiners Union of America v. Ritter's Cafe, supra.* In that case, the owner of a restaurant entered into a contract for the construction of a building at some distance from his restaurant. After the construction of the building was started, a labor dispute arose between the men building that building and the contractor. The employees of the contractor started to picket the building under construction and the restaurant. The supreme court of Texas enjoined the picketing of the restaurant. The United States supreme court agreed, and held that granting of the injunction was not a denial of the constitutional right of free speech. That case is no authority for the conclusion that the picketing in the case at bar is coercion. The national labor relations board was not involved and at no place does the court indicate the effect of an order issued by the national labor relations board.

The picketing in the instant case was, as set forth in respondents' answer and shown by the evidence, for the purpose of informing members of the American Federation of Labor, as well as the public, that appellant did not employ any workers affiliated with the American Federation of Labor, and for the purpose of persuading appellant's employees to join the craft unions and thereby protect the established union wage rates and working conditions enjoyed by members of craft unions in the Seattle area.

It does not necessarily follow, although in this case we can assume that it is true, that the ultimate effect of this picketing was to close appellant's plant. In reference to this question, we stated in *State ex rel. Lbr. & Sawmill Workers v. Superior Court,* 24 Wn. (2d) 314, 164 P. (2d) 662, speaking on p. 333, as follows:

"The relators are doing only what, under the authorities, they have a legal right to do; therefore, their acts are not unlawful. If the ultimate effect of the picketing be to close

the plants, that result would occur because of the acquiescence of the C. I. O. employees who accepted the counsel of the A. F. of L. pickets. It is the purpose of the A. F. of L. to communicate a point of view—there is nothing in the national labor relations act which expressly or impliedly prohibits such conduct—to the C. I. O. employees, who are free to decide whether they will agree or disagree with the view of the A. F. of L."

In the *Bloedel Donovan* case, *supra*, the employer was neutral, and the two disputing unions submitted their grievance for determination by the national labor relations board. After an election was held, the national labor relations board entered an order finding that one of the unions was the sole bargaining agent.

In the case at bar, the employer was not neutral, but was an active participant and injected himself into the controversy on the side of one of the unions. The regional director of the national labor relations board entered a finding after a cross-check that 29 of the 32 employees of appellant were members of the Machinists' union, and he therefore found and determined that that union was the exclusive bargaining agent. The question of the dispute between appellant employer and the craft unions was never submitted to the national labor relations board. The craft unions did not participate, and in fact were ineligible to participate, in the cross-check conducted by the national labor relations board. There has never been, by anyone, any determination of the rights of the craft union other than such determination as this court makes in this case, and the majority opinion bases its conclusion upon the fact that the rights of the craft union have been heretofore determined.

Apparently, the national labor relations board has no machinery to determine the labor dispute which existed in this case, and a careful reading of the act creating the board would indicate that it is impossible for that agency to attempt to determine the labor dispute between appellant and respondent craft unions.

In *State ex rel. Lbr. & Sawmill Workers v. Superior Court,* 24 Wn. (2d) 314, 164 P. (2d) 662, we distinguished the *Bloedel Donovan* case, *supra,* and said, on p. 331:

"*Bloedel Donovan Lbr. Mills v. International Woodworkers of America,* 4 Wn. (2d) 62, 102 P. (2d) 270, is distinguish- able from the cases at bar. In the *Bloedel Donovan* case, in which we sustained a judgment enjoining the picketing of the plants of the Bloedel Donovan company, the national labor relations board had certified one union as the exclusive bargaining agency. A minority union called a strike and picketed the employer's business for the sole purpose, as stated in the opinion, of doing away with the closed shop agreement with the bargaining agent which the national labor relations board had certified as the exclusive bargaining agency. The minority union was proceeding unlawfully. Its demand that the employer breach its agreement with the certified bargaining agency was an endeavor to compel the employer to violate the terms of the Wagner act, and if the employer had acceded to the demand, the employer would have been guilty of unfair labor practices, subjecting the employer to penalties under the Federal statute. In the cases at bar, the relators are not seeking anything from the employers. They have not done anything which savors of an attempt to compel the employers to do that which is unlawful. They have not attempted to compel the employers to deal with the A. F. of L. instead of with the C. I. O. There is no conflict with Federal or state law. In soliciting mutual co-operation with the C. I. O., the A. F. of L. exercised a right guaranteed to it under the national labor relations act, 29 U. S. C. A., § 151 *et seq.*"

There is a very decided difference between the controversy which arose and was decided by the national labor relations board in the *Bloedel Donovan* case, *supra,* and the report on cross-check in the instant case. Here, respondent unions had not participated in any proceedings before the national labor relations board, and in fact they had no right to participate. There was a labor dispute between appellant and the craft unions. There has never been any proceedings before the national labor relations board or any other board to determine that dispute. The employer, appellant, in-

jected himself into the controversy and was not neutral. The judgment of the trial court should be affirmed.

MALLERY, C. J., dissents.

---

March 25, 1947. Petition for rehearing and motion for stay of mandate denied.

[1]Reported in 177 P. (2d) 886.