205 P.2d 1131

**STATE v. CASSELMAN.**

**STATE v. TOWNE.**

**STATE v. ABEL.**

**STATE v. HILL.**

Nos. 7502–7505.

Supreme Court of Idaho.

May 2, 1949.

Robert E. Smylie, Atty. Gen., and James W. Blaine, Pros. Atty., of Boise, for respondent.

Anderson & Thomas, of Boise, for appellants.

J. L. Eberle, B. S. Varian and D. O. Morgan, all of Boise, amici curiae.

GIVENS, Justice.

Appellants were convicted of violating Chapter 265, 1947 Session laws, page 788.[1] Separate appeals were consolidated for hearing and determination herein. Appellants waived a jury and were tried by the court on a stipulation of facts, epitomized as follows:

The American Telephone and Telegraph Company is the head of and owns the controlling interest in 23 separate, individual, corporate subsidiaries of a federation giving nationwide telephone service, of which

---

[1] "Section 1. Secondary Boycott. It shall be unlawful to cause or threaten to cause, and/or combine or conspire to cause or threaten to cause, injury to one not a party to the particular labor dispute, to aid which such boycott is initiated or continued, whether by (a) withholding patronage, labor, or other beneficial business intercourse; (b) picketing; (c) refusing to handle, install, use or work on particular materials, equipment or supplies; or (d) by any other means, in order to bring him against his will into a concerted plan to coerce or inflict damage upon another or to compel the party with whom such labor dispute exists to comply with any particular demands.

"Section 2. Penalty. Any person, firm, individual, corporation, labor organization or association of persons found guilty of committing, or causing to be committed, any of the acts herein declared to be unlawful, shall be deemed guilty of misdemeanor." Chapter 265, 1947 Session Laws, p. 788.

the Mountain States Telephone & Telegraph Company (hereinafter designated Telephone Co.), organized in Colorado; and the Western Electric Company (hereinafter designated Electric Co.), organized in New York, are members.

Each subsidiary, in addition to dividends, pays 1½% of its gross operating revenue to the parent company, mostly used to operate the Bell Laboratories.

The Annual Reports of the American Telephone and Telegraph Company and the Mountain States Telephone and Telegraph Company, 1946, and Handbook for Installation Information of the Electric Company, and an advertisement in Life Magazine, January 2, 1947, pp. 108–9, entitled "Up from the Ranks," were admitted as exhibits.

The Electric Co. engineers, fabricates and installs central office equipment in, and upon order from the various affiliates, its employees working mostly in their buildings and central offices, and at all times since November 1946 have been so doing for the Telephone Co. in its building. The Boise headquarters of the Electric Co. are under written contract with and in the central office building of the Telephone Co. at 609 Main Street, including lights, heat and toilet facilities. The foremen of the Electric Co. keep their records there and receive reports from their employees, who congregate and work there, such room being solely under the control of the Electric Co., situated on the ground floor off the main hall.

Each subsidiary employs and pays its own employees, who are in separate unions: for the Telephone Co., the Mountain States Federation of Telephone Workers; and for the Electric Co., the Association of Communication Equipment Workers; both unions are affiliated with and part of the National Federation of Telephone Workers.

Employees of the operating companies and the Electric Co. may, but not as a matter of right, transfer from one to the other without loss of benefits, but as to the latter company, must take special training, and must in either event transfer his or her union membership.

April 7, 1947, both subordinate unions struck as against their respective employers, over separate labor contracts. The American Telephone and Telegraph Company refused to bargain with the National Federation of Telephone Workers as the bargaining agent for the subordinates, except as to long distance operators, for the reason it had no authority to represent the affiliated companies.

The separate labor disputes were settled individually; that between the Telephone Co. and its union employees at 12:01 A.M. May 15, 1947, and that of the Electric Co. May 21, 1947.

April 7 to May 14, pickets of the two unions peaceably patrolled the public street and thoroughfare in front of the Telephone

Co. building, bearing strike placards Exhibits E [2] and F.[3]

After the settlement and ending of the strike against the Telephone Co., appellants, employees of the Electric Co., continued such picketing, carrying the same placards, and employees of the Telephone Co. therefore declined to work and its service was restricted. These prosecutions and convictions ensued.

Appellants'. assignments of error urge their demurrers should have been sustained and thereby and otherwise challenge the statute as unconstitutional, violating the Sixth and Fourteenth amendments of the United States Constitution and Article I, Sections 9, 10 and 13 of the Idaho Constitution, because it does not define "labor dispute" and "one not a party to a labor dispute" and neither has a technical, special or historical uniform or common-law meaning well enough known to the public to correctly apply it and that the statute is too vague and indefinite; that the evidence does not show appellants picketed the Telephone Co., nor that it was not a party to the labor dispute; and that there was, as to it, a primary, not a secondary boycott.

A criminal statute must be reasonably definite in defining the offense. State v. Groseclose, 67 Idaho 71, 171 P.2d 863. If a criminal statute is deficient in this respect, it violates due process and cannot stand. Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888; Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322.

Appellants thus present as a complete defense this proposed dilemma: First, that since there is no definition in Chapter 265, supra, of "labor dispute" or "party to the labor dispute," the statute is so deficient as to be unconstitutional under the above authorities; or second, a two-pronged horn in that, if the legislature intended the definition of a labor dispute in Chapter 266, 1947 Session Laws, p. 789,[4] to be the definition to be applied in Chapter 265 supra,

2 "Bell System Monopoly
Versus .
Telephone Folks

Your Neighbors and Your
Friends

On Strike
for a
Decent Wage

National Federation of Telephone
Workers"

3 "The Voice With A Smile
Will Be Gone For Awhile

$210,000 a Year for Mr. Gifford.
We Want $12 a Week increase to
Maintain an American Standard
of Living

Strike

National Federation of Telephone
Workers"

4 "The term 'labor dispute' means any controversy between an employer and the majority of his employees in a collective bargaining unit concerning the right or process or details of collective bargaining or the designation of representatives." Chapter 266, 1947 Session Laws, p. 789.

and it be applied literally, it is unconstitutional as violating the rule in various cases and thus announced in American Federation of Labor v. Swing, 312 U.S. 321, 61 S. Ct. 568, 570, 85 L.Ed. 855, at page 857:

"We are asked to sustain a decree which for purposes of this case asserts as the common law of a state that there can be no 'peaceful picketing or peaceful persuasion' in relation to any dispute between an employer and a trade union unless the employer's own employees are in controversy with him.

"Such a ban of free communication is inconsistent with the guaranty of freedom of speech. That a state has ample power to regulate the local problems thrown up by modern industry and to preserve the peace is axiomatic. But not even these essential powers are unfettered by the requirements of the Bill of Rights. The scope of the Fourteenth Amendment is not confined by the notion of a particular state regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the state. A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing the circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. American [Steel] Foundries v. Tri-City

[Central Trades] Council, 257 U.S. 184, 209, 42 S.Ct. 72, 78, 66 L.Ed. 189, 199, 27 A.L.R. 360. The right of free communication cannot therefore be mutilated by denying it to workers, in a dispute with an employer, even though they are not in his employ."

and if not applied literally, it must comprehend that when employers are, as appellants contend the Telephone Co. and the Electric Co. are, industrially connected, not wholly outside the economic context of the dispute (strike against the Electric Co.) with interdependent and economic interests so closely intertwined as, if their corporate veil be pierced, to make the Telephone Co. in reality a party to the strike against the Electric Co. and hence, picketing it would not constitute a secondary boycott, declaring: "It is not a question of whether or not a state has the power to declare a secondary boycott unlawful; it is a question of whether or not the language used in the statute under consideration defines a secondary boycott not only with clearness and precision but whether or not it also limits a secondary boycott to picket action directed against a neutral or whether it is broader in scope and includes within its framework all those who do not bear the relationship of employee to those who are picketed. This is the crux of the question so far as the constitutionality of the act is concerned. We state that the act has offended in both respects."

The State urges the common understanding and ordinary and accepted meaning ascribed to this term (labor dispute) may supply a definition and suggests it is commonly understood to mean the visible manifestation of economic strife between an employer and its employees—such being in line with the definition in Chapter 266, and that under holdings hereafter noted, the definition in Chapter 266 is appropriately to be considered in pari materia with Chapter 265.

Amici curiae contend that dispute (labor!) means an argument between one party and another, and every person knows he is having an argument or dispute with another particular person, and that the court may supply whatever definition is necessary, and argue against conjoining Chapter 266.

The 1947 Senate Journal, page 263, shows that Chapter 265, 1947 Session Laws, was proposed as Senate Bill 110 and Chapter 266, 1947 Session Laws, as Senate Bill 113, by the Immigration and Labor Committee, February 17. Both were passed by the Senate March 3, Chapter 266 being passed first, Senate Journal pp. 424, 426. The order of passage was reversed in the House March 7, House Journal p. 570, and both were approved by the Governor March 19.

It will be noted that Chapter 266, amending Section 12, Chapter 215, 1933 Session Laws, p. 452 at page 459, eliminated the previous subdivisions thereof (a) (1) (2) (3) (b) and likewise the restrictive clause "when used in this Act, and for the purposes of this Act".

This court has consistently held that statutes passed at the same session and having to do with the same subject matter are to be considered in pari materia and construed together as though parts of one act, Oneida County v. Evans, 25 Idaho 456, 138 P. 337; Peavy v. McCombs, 26 Idaho 143, 140 P. 965; Garrett Transfer etc. Co. v. Pfost, 54 Idaho 576, 33 P.2d 743; State v. Mead, 61 Idaho 449, 102 P.2d 915, and such rule has been applied to a criminal statute in connection with an essential definition therein. State v. McBride, 33 Idaho 124, 190 P. 247. The above rule has been held particularly applicable to statutes passed on the same day. Chandler v. Lee, 1 Idaho 349; Garrett Transfer etc. Co. v. Pfost, supra, 54 Idaho at page 583, 33 P.2d 743; Lambert v. Board of Trustees of Public Library, 151 Ky. 725, 152 S.W. 802, at page 804, Ann.Cas.1915A, 180; State ex rel. Barrett v. Dallmeyer, 295 Mo. 638, 245 S.W. 1066, at page 1068.

The primary lodestar is legislative intent. If substance, not form is to control, the decisive point is whether the several statutes are in pari materia and so intended by the legislature and not whether one is criminal and the other civil. The authorities support such conclusion by pronouncement and application.

"In 23 California Jurisprudence, p. 785, where many authorities are cited in its support, the rule is thus stated: 'In accordance

with the principle that a statute is construed in connection with and as a part of the body of legislation upon the general subject, it is a settled rule that all statutes which relate to the same general subject-matter—briefly called statutes in pari materia—must be read and construed together, as one act, each referring to and supplementing the other, though they were passed at different times.'

"It is also a rule of construction of the statutes of this state that each of the provisions contained in the four codes should be construed with relation to all the other provisions thereof; in other words, that the entire body of the law should be regarded as a single statutory provision, and therefore within the rule that all parts of a statute should be construed together." People v. Roland, 134 Cal.App. 675, 26 P.2d 517, at page 520.

"Similar expressions in civil and criminal statutes dealing with same general subject should be given uniform construction (Cr.Code Prac. § 364; Civ.Code Prac. § 724)." Commonwealth v. Bates, 235 Ky. 763, 32 S.W.2d 334, syl. 3.

"In construing this statute we are convinced that it must be considered in pari materia with all statutes relating to the same subject; that is, closed or open seasons for the killing of such game as is described therein and in the information before us.

"By the Game Code of 1925 the killing of elk throughout the state at all times was prohibited. By this same Code, in section 8, the Legislature placed an interpretation that should be followed by all courts and officers upon open and closed seasons, and prescribed that each period of time prescribed as an open season shall be construed to include the first and last days thereof. It does not appear that the subsequent chapter (chapter 291, Laws 1927) covered the whole subject-matter of the former one, or was intended to take its place. Hewitt-Lea Lumber Co. v. Chesley, 68 Wash. 53, 122 P. 993.

"It has been well settled in this jurisdiction that 'All laws upon a given subject should be construed together, so as to produce a harmonious system, if possible; the presumption being that a new law relating to such subject was enacted with reference to the former laws.' (Citing cases.)

"Laws that are in pari materia will be read together, for the purpose of ascertaining the legislative intent." State v. Herr, 151 Wash. 623, 276 P. 870, at page 872.

"Looking at article 739 alone, without the aid of said civil statutes, it is true that it would be impossible to determine just what is meant by 'lawful authority.' However, we are not in accord with the contention of appellant's counsel that the Legislature, in adopting this Code, intended, under section 3, to prohibit this court from referring to and taking into consideration the civil statutes pertaining to the Medical Practice Act, as herein

246

urged. * *· *" Compere v. State, 107 Tex.Cr.R. 95, 295 S.W. 614, at page 615.

See also Chappell v. Lancaster County, 84 Neb. 301, 120 N.W. 1116.

Civil and criminal statutes were construed as complementary and in pari materia in Barnes v. State, 75 Tex.Cr.R. 188, 170 S.W. 548, on rehearing.

In a criminal prosecution under a minimum wage law, Chapter 12, 1933 Arizona Session Laws, p. 15,[5] thus involving a phase of labor legislation, as herein, the court considered and applied a civil statute, Chapter 71, 1933 Arizona Session Laws, p. 292,[6] thus: "It is the general rule that where statutes are in pari materia and the later one does not expressly repeal the former, the two are to be construed so as to give effect to each, if possible. (Cases.) And this applies with peculiar force when the statutes are adopted at the same session of the Legislature." State v. Jaastad et al., 43 Ariz. 458, 32 P.2d 799, at page 800.

It is argued that Chapter 215 of the 1933 Session Laws had to do only with injunctions and, therefore, the definition therein could have no application to Chapter 265. Two cogent reasons militate against this conclusion: First, the elimination of the clause originally in Section 12, that "when used in this Act, and for the purposes of this Act", which makes it of general application; and second, a definition is as necessary in Chapter 265 as in Chapter 215 and it is axiomatic that courts must act upon the assumption that the Legislature intended to enact a valid and constitutional law. Northern Pac. R. Co. v. Shoshone County, 63 Idaho 46, 116 P.2d 225; State ex rel. Wright v. Headrick, 65 Idaho 148, 139 P.2d 761. Therefore, it intended the definition in Chapter 266, now general because not restricted, to be the definition essential and concomitant to Chapter 265. Chapters 265 and 266 apply· to the common subject of labor regulations and thus are in pari materia, germane and to be construed together. Stearns v. Graves, 61 Idaho 232, 99 P.2d 955; Union

[5] Provides that any person employed by the State or its political subdivisions shall work no more than eight hours per day, except in an emergency and be paid not less than the fixed minimum per diem wages and shall be bona fide residents of the State; that the contractors be licensed and satisfactory, and preference be given to resident tax-paying contractors and to material produced or manufactured in Arizona, and to tax-paying dealers, yielding to Federal aid regulations, and requiring the state or subdivision thereof to make good any deductions by reason of such preferences; that any violation of these provisions is a misdemeanor punishable by fine and/or imprisonment. Condensation of Chapter 12, 1933 Arizona Session Laws, p. 15.

[6] Relates to Public Works and provides for the payment of not less than the general prevailing rate of wages for work of similar nature, ascertained from the industrial commission of Arizona; for the forfeiture of $5 to the state or political subdivision for each workman employed for each calendar day or portion thereof that such person is paid less than the designated rates; and that contractors shall keep accurate records. Condensation of Chapter 71, 1933 Arizona Session Laws, p. 292.

Pac. R. Co. v. Riggs, 66 Idaho 677, 166 P.2d ·926.

We must, perforce, conclude that in applying and construing Chapter 265, the definition of labor dispute in Chapter 266 is to· be considered as applicable.

The Swing case, decided in 1940, dealt with the issuance of an injunction and application by the state courts of the common law.

"No statutory violations were involved in the Swing case. The opinion of the ·court, 61 S.Ct. page 569, 85 L.Ed. page 856, states the issue to be merely: 'Is the constitutional guarantee of freedom of discussion infringed by the common law policy ·of a state forbidding resort to peaceful persuasion through picketing merely because there is no immediate employer-employee dispute?' It is also stated in the opinion, .61 S.Ct. page 570, 85 L.Ed. page 857: 'All that we have before us, then, is an instance .of "peaceful persuasion" disentangled from violence and free from "picketing en masse or otherwise conducted" so as to occasion "imminent and aggravated danger." '

"We should not extend the rule of that case beyond the point at which the court itself stopped." Wisconsin Employment Relations Bd. v. Milk & Ice Cream Drivers & Dairy Employees Union, etc., 238 Wis. .379, 299 N.W. 31, at page 39.

Herein, we are dealing with a statute passed to restrict and limit picketing. The same Justice who wrote the Swing case, later in 1942, wrote Carpenters and Joiners Union v. Ritter's Cafe, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143, wherein the Court considered the right of the State of Texas to pass and construe a statute held to limit picketing, because while the prosecution was brought under an anti-trust statute, Vernon's Ann.P.C. art. 1632, the Court's opinion did not discuss its view of that law, but based its decision on the theory that a state may confine the sphere of communication by picketing to that directly connected with it. Empire Storage & Ice Co. v. Giboney et al., Mo.Sup., 210 S.W.2d 55, at page 58.

In Carpenters & Joiners Union v. Ritter's Cafe, supra, respondent Ritter was the owner of a cafe about a mile and a half away from where he was having a building constructed. His restaurant employees were members of a local union and had no controversy with him. The contractor who was erecting Ritter's house employed non-union · labor. Members of the Carpenters and Joiners Union then picketed the cafe. The effect was· to prevent members of the trade unions from patronizing the cafe. Barriers were thus erected around respondent's cafe, against which no member of the union or its affiliates would go, as herein. An injunction was sought and obtained under a so-called anti-trust Texas statute. It was urged that such picketing, being peaceful, was immune from regulation and that the State statute could not be applied and enforced to pro-

hibit picketing without violating the due process clause of the Fourteenth amendment—identical with the contention raised here. The Court said [315 U.S. 722, 62 S.Ct. 809]: "The constitutional right to communicate peaceably to the public the facts of a legitimate dispute is not lost merely because a labor dispute is involved, Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, or because the communication takes the form of picketing, even when the communication does not concern a dispute between an employer and those directly employed by him. American Federation of Labor v. Swing, 312 U.S. 321, 61 S.Ct. 568, 85 L.Ed. 855. But the circumstance that a labor dispute is the occasion of exercising freedom of expression does not give that freedom any greater constitutional sanction or render it completely inviolable. Where, as here, claims on behalf of free speech are met with claims on behalf of the authority of the state to impose reasonable regulations for the protection of the community as a whole, the duty of this Court is plain. Whenever state action is challenged as a denial of 'liberty', the question always is whether the state has violated 'the essential attributes of that liberty'. Mr. Chief Justice Hughes in Near v. Minnesota, 283 U.S. 697, 708, 51 S.Ct. 625, 628, 75 L.Ed. 1357, [1363]. While the right of free speech is embodied in the liberty safeguarded by the Due Process Clause, that Clause postulates the authority of the states to translate into law local policies 'to promote the health, safety, morals, and general welfare of its people * * *. The limits of this sovereign power must always be determined with appropriate regard to the particular subject of its exercise.' Id., 283 U.S. at page 707, 51 S.Ct. [625], at page 628, 75 L.Ed. 1357, [1363]. 'The boundary at which the conflicting interests balance cannot be determined by any general formula in advance, but points in the line, or helping to establish it, are fixed by decisions that this or that concrete case falls on the nearer or farther side.' " Cases cited.

Thus, the Ritter case as the latest expression of the Supreme Court, if it does not sanction, at least does not bar, states from passing a statute prohibiting secondary boycotts and holds that common ownership of two businesses does not afford such nexus or connection as to make the picketing of one a primary boycott in picketing the other. Such conclusion is strengthened by the majority opinion in Bakery & Pastry Drivers & Helpers of International Brotherhood of Teamsters v. Wohl, 315. U.S. 769, 62 S.Ct. 816, 819, 86 L.Ed. 1178, at page 1184, thus: "A state is not required to tolerate in all places and all circumstances even peaceful picketing by an individual." And the specially concurring opinion written by Justice Douglas and concurred in by Justices Black and Murphy: "Picketing by an organized group is more than free speech, since it involves patrol of a particular lo-

cality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those aspects of picketing make it the subject of restrictive regulation."

Such conclusion has been thought justified by other courts. See Retail Clerks' Union, etc., v. Wisconsin Emp. Rel. Board, 242 Wis. 21, 6 N.W.2d 698, at pages 707, 708, 149 A.L.R. 452; American Fed. of Labor v. American Sash & Door Co. et al., 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. ——; Giboney et al. v. Empire Storage & Ice Co., 69 S.Ct. 684.

"We find no case in the decision of the United States Supreme Court which forbids the State of New York to limit picketing to a labor dispute as defined in said Section 876-a." People v. Fleishman, Sp. Sess., 36 N.Y.S.2d 559, at page 567.

In the Ritter case, the contractor was doing work for Ritter and his union was picketing Ritter's Cafe. The court held they could not picket the other place of business of the common owner. The connection asserted here by appellants is by reason of the work the Electric Co. was doing for the Telephone Co. and that piercing the corporate veil, they were one or at least in the same industrial field. There was, however, a closer connection in the Ritter case than here, because Ritter owned both places and the work was being done for him; while the American Telephone and Telegraph Company owns both subsidiaries, the work was not being done for it, but by one subsidiary for the other. The nexus or connection must be such as to make the one actually a party to the labor dispute and is not dependent upon where the business is being conducted.

It is urged, however, that the employees of the Electric Co. may only effectively picket if they do so in front of an entrance which is common and must be used by employees of both concerns.

The banners or placards which were carried after the strike between the Telephone Co. and its employees was settled, were identical with those carried before. The statute under which this prosecution was brought, provides that: "It shall be unlawful to cause * * * injury to one not a party to the particular labor dispute, * * * by * * * picketing; * * *." These banners did not differentiate or distinguish or indicate the picketing was being done against the Electric Co. and not against the Telephone Co. Conceding the appellants had the right to picket the entrance of the place of business of the Electric Co., when they did so with placards or banners which did not clearly and specifically indicate the labor dispute was restricted to their employer and by reason of such failure, injured the Telephone Co., which the stipulation shows they did, they were guilty of violating the statute. Swenson v. Seattle Central Labor Council, 27 Wash.2d 193, 177 P.2d 873, 170 A.L.R. 1082; Robison et al. v. Hotel &

250

Restaurant Employees Local No. 782, 35 Idaho 418, 207 P. 132, 27 A.L.R. 642.

■ Conceding that under the Fourteenth amendment they had the right to picket as a form of free speech as against their employer, they had no right to picket in such a way as to injure someone else not a party to that labor dispute, in violation of the statute.

"The decree in this case forbidding picketing by defendants forbade only the picketing about plaintiff's premises. We affirm the decree. There is nothing in the decree which restrains defendants from informing the public of any labor dispute they may have with the peddlers by any unlawful (lawful) means of dissemination of information, including picketing, wherever the same may be proper. Under these circumstances we hold the decree does not contravene defendants' right of free speech under the Federal or State Constitutions." Empire Storage & Ice Co. v. Giboney, supra, 210 S.W.2d at page 58.

If legal picketing necessitates it being carried on before a common entrance used by employers and their employees not parties to the labor dispute with which the picketing is being carried on, it must be so conducted as not to cause damage to such other employers; otherwise, it violates Chapter 265, supra.

■ It is also urged that because the Electric Co. is a subsidiary of the American Telephone and Telegraph Company, as is the Telephone Co., and the Electric Co. renders service essential to the Telephone Co. and that members of the two constituents, though separate unions, may pass from one to the other, there is such connection as to make this a primary labor dispute as between the employees of the Electric Co. and the Telephone Co. and that the corporate veil should thus be pierced. The stipulated facts do not state or hint that the separation of the different subsidiary corporations was a subterfuge or evasion, as in Newark Ladder & Bracket Sales Co. v. Furniture Workers Union, etc., 125 N.J.Eq. 99, 4 A.2d 49, relied on by appellants. The contrary appears to be true, as the Electric Co. was organized in 1881 and in addition to manufacturing telephone instruments, cables, switchboards, etc., its products are used in other fields of transmission, reproduction and amplification of sound with manufacturing and distributing plants widely dispersed throughout the United States. The Telephone Co. operates only in seven intermountain states, apparently incorporated in 1911.

The stipulation clearly discloses that the respective parties, both employers and employees, differentiated and thereby designated the parties to the two distinct labor disputes and there was no common, joint or interdependent interest sufficient to unite them in settling such disputes. If the Telephone Co. was a party to the labor dispute of the Electric Co., then the

reverse would be true, but both unions and employers recognized such was not the case, because the labor dispute between the Telephone Co. and its employees was settled and ended without interference, opposition or acquiescence by the Electric Co. or the American Telephone and Telegraph Company. The parties recognized the Telephone Co. was not a party to the Electric Co. dispute when both were striking and picketing, because separate settlements were made. By no legalistic legerdemain was the Telephone Co. a party after such settlement. Such recognition of and agreed action upon two separate labor dispute settlements outweighs and makes inapplicable the asserted agglomeration detailed in the Electric Co.'s handbook and reports of the American Telephone and Telegraph Company and the Telephone Co. and the advertisement in Life, in determining the distinctness of the parties to the labor disputes herein.

Appellants argue a settlement resulting in lower wages to the Electric Co. employees would redound to the benefit of the Telephone Co., but unless the Telephone Co. had a voice in the affairs of the Electric Co., and the stipulation shows they had none, they would be in no different position from any purchaser of services or goods from the Electric Co. Appellants' extended arguments that there is such connection between the Telephone Co. and the Electric Co. all summed up, merely demonstrate that coercion is the effective force of a secondary boycott and this statute bars such secondary compulsion when it causes injury.

The labor controversies between the two constituents and their unions were not negotiated or settled by the parent Company. The stipulation shows the parent Company had no authority to represent the subsidiaries and hence, no power to bind or control them and the separate settlements show the constituent unions acquiesced in this. As the parent had no control, the subsidiary would have even less over another subsidiary. Conceding the American Telephone and Telegraph Company owns the controlling stock in the subsidiaries, each corporation acted alone and settled its own disputes. The stipulation does not disclose any attempted control or effort in that regard. In other words, the labor disputes were separate as between the two subsidiary companies and their unions and were settled as such, and when so settled, the employees of the Telephone Co. no longer had any dispute with their employer, nor was there any dispute between the employees of the Electric Co. and the Telephone Co. or between them and the American Telephone and Telegraph Company. The dispute was solely between the Electric Co. and its union's members. Therefore, when they picketed as they did and caused injury to the Telephone Co., they violated the plain wording and intent and spirit of the interdicting statute.

"Even where the social undesirability of a law may be convincingly urged, invalidation of the law by a court debilitates popular democratic government. Most laws dealing with economic and social problems are matters of trial and error. That which before trial appears to be demonstrably bad may belie prophecy in actual operation. It may not prove good, but it may prove innocuous. But even if a law is found wanting on trial, it is better that its defects should be demonstrated and removed than that the law should be aborted by judicial fiat. Such an assertion of judicial power deflects responsibility from those on whom in a democratic society it ultimately rests—the people" (i. e. the Legislature). Concurring opinion, American Fed. of Labor v. American Sash & Door Co., supra [335 U.S. 538, 69 S.Ct. 260, 265].

The judgments are affirmed.

PORTER, J., and SUTPHEN and SUTTON, District Judges, concur.

HOLDEN, Chief Justice (dissenting).

The question presented to this court for determination is not as to whether the 1947 statute prohibiting secondary picketing is a good or a bad law. The only question presented by the record in the case at bar is this: Is the 1947 statute (prohibiting secondary picketing) unconstitutional? Its constitutionality is attacked upon the ground it does not define what act, or acts, will constitute a violation of the statute, so that a person would know before he does the act, that if he does, he thereby commits a crime.

The rule by which the constitutionality of criminal statutes must be tested is universally held to be that "An act of the Legislature creating a statutory offense should define the acts necessary to constitute such offense with such certainty that a person may determine whether or not he has violated the law at the time he does the act, which is charged to be a violation thereof." State v. Burns, 53 Idaho 418, 426, 23 P.2d 731, 734, adhered to, approved and followed by this court in the recent case of State v. Mead, 61 Idaho 449, 455, 102 P.2d 915.

The majority concedes the secondary picketing statute as enacted, and standing alone, when tested by the above quoted rule, is unconstitutional, but it argues that by the application of a certain rule of construction of statutes (familiar to lawyers and jurists), all statutes relating to the same general subject matter—briefly called statutes in pari materia, may be read and considered together as though they were actually one and the same statute. And then the majority cite and follow with approval certain cases holding both civil and criminal statutes may be so read and considered together, and furthermore, and in effect, that the provisions of the codes

of this state, now numbering some ten volumes may, under the "pari materia rule", be considered together, "in other words, that the entire body of the law should be regarded as a single statutory provision, and therefore within the rule that all parts of a statute should be construed together."

It is my view the courts so holding, and the majority in approving and following the decisions of such courts, have gone too far. Some attention should be given to well known and universally accepted facts, to-wit, that laymen are not trained and, therefore, ought not to be required, to search through the codes and also to analyze decisions, no matter how numerous, for the purpose of ascertaining whether some civil statute buried somewhere in one of the codes could be held to be in pari materia with some criminal statute, for example, the statute prohibiting secondary picketing. In other words, it seems to me a reasonable limit ought to be set to the application of the "pari materia" rule.

Surely, the defendants in the case at bar could not be expected, and furthermore, ought not to be required, to make the same investigation and the same analyses of the decisions, the author of the majority opinion made. Be that as it may, from now on laymen must be lawyers and able ones, too, or suffer the consequences.

For the reasons above stated I can not agree with the majority.